Patrick Joseph **TURNER**, et al.

v.

**MURPHY OIL USA, INC.**

No. Civ.A. 05–4206.

United States District Court,
E.D. Louisiana.

Jan. 30, 2007.
Order Denying Amendment
Feb. 28, 2007.

See, also, 422 F.Supp.2d 676.

---

**64.** The Court has considered all arguments of counsel whether specifically addressed herein or not.

Mickey P. Landry, David Ryan Cannella, Frank J. Swarr, Landry & Swarr, LLC, Christopher H. Sherwood, John Robert Martzell, Scott R. Bickford, Brock Darren Dupre', Spencer R. Doody, Jeffrey Matthew Burg, Martzell & Bickford, Joseph M. Bruno, David Scott Scalia, Bruno & Bruno, Amy Collins Fontenot, Val Patrick Exnicios, Liska, Exnicios & Nungesser, Stephen Skelly Kreller, Stephen S. Kreller, APLC, Frank Jacob D'Amico, Jr., Christopher T. Castro, Frank J. D'Amico, Jr., APLC, Mark Philip Glago, Glago Law Firm, Anthony D. Irpino, Irpino Law Firm, Darleen Marie Jacobs, Jacobs & Sarrat, Ethel Carroll Rogers, Murphy, Rogers, Sloss & Gambel, Jennifer N. Willis, Cater & Willis, Stuart Housel Smith, Michael G. Stag, Amber E. Cisney, Smith Stag, LLC, Hugh Palmer Lambert, Linda Jane Nelson, Evelyn Alexis Bevis, Lambert & Nelson, Bruce S. Kingsdorf, Dawn M. Barrios, Barrios, Kingsdorf & Casteix, LLP, Gerald Edward Meunier, Irving Jay Warshauer, Gainsburgh, Benjamin, David, Meunier & Warshauer, Jerald N. Andry, Jr., Walter John Leger, Jr., Christine Lynn Desue, Leger & Mestayer, Russ M. Herman, Herman, Herman, Katz & Cotlar, LLP, Gilbert V. Andry, III, Andry & Andry, Paul M. Sterbcow, Lewis, Kullman, Sterbcow & Abramson, John M. Futrell, Lee, Futrell & Perles, LLP, William F. Bologna, Dwight Leblanc Acomb, W.F. Bologna & Associates, Les Anthony Martin, Alaraby J. Johnson, Neil Franz Nazareth, Richard Arthur Bordelon, Ralph Joseph Aucoin, Denechaud & Denechaud, Henry St. Paul Provosty, Christophe B. Szapary, Provosty & Gankendorff, LLC, Jonathan Beauregard Andry, Gilbert V. Andry, IV, The Andry Law Firm, Lloyd N. Frischhertz, Frischhertz & Associates, Michael Gerald Gaffney, Hurndon & Gaffney, Alex Donner Lambert, Nolan Patrick Lambert, Lambert & Lambert, Randy George McKee, N. Sundiata Haley, Carter, Haley & McKee, LLC, Jack Anthony Ricci, Gary John Giepert, Ricci & Giepert, Shirin E. Harrell, Christina I. Sprecher, Eric R. Nowak, Harrell & Nowak, LLC, F. Gerald Maples, Carlos Alberto Zelaya, II, J. Stuart Kirwan, Meredith Anne Mayberry, Stephen Michael Wiles, Law Offices of F. Gerald Maples, P.A., Clayton Morris Connors, Mumphrey Law Firm, LLC, R. Ray Orrill, Jr., W. Christopher Beary, Orrill, Cordell & Beary, LLC, Paul Edward Mayeaux, Robert L. Manard, III, Robert L. Manard, PLC, David V. Batt, Rachel Ann Meese, Lobman, Carnahan, Batt, Angelle & Nader, G. Karl Bernard, G. Karl Bernard & Associates, LLC, Richard J. Richthofen, Jr., Richthofen & Associates, LLC, Michael J. Phillips, David S. Moyer, Taggart, Morton, Ogden, Staub, Rougelot, & O'Brien, LLC, Henry L. Klein, Tara Elizabeth Clement, Kinney & Ellinghausen, Robert Wayne Drouant, New Orleans, LA, Joseph F. Rice, Ronald L. Motley, Motley, Rice, LLC, Mt. Pleasant, SC, Michael Gerald Calogero, Law Offices of Michael G. Calogero, L.L.C., Bruce Betzer, Edward Pressner Gothard, Nowalsky,

834

Bronston & Gothard, APLLC, George Luis Beguiristain, Kailas Management, Lynn E. Williams, Jr., Lynn Eric Williams, Jr., APLC, Scott W. Smith, Scott W. Smith, LLC, Thomas A. Gennusa, II, Joseph S. Piacun, Gennusa Law Firm, Raymond Anthony Milly, George Brian Recile, Chehardy, Sherman, Ellis, Breslin, Murray, Recile & Griffith, Peter Marion Meisner, Delise, Amedee & Hall, Frank Reynolds Whiteley, Juge, Napolitano, Guilbeau, Ruli, Frieman & Whiteley, Kevin Francis Tucker, Metairie, LA, Roberta L. Burns, Sidney Donecio Torres, III, Law Offices of Sidney D. Torres, III, Ronnie Glynn Penton, Law Offices of Ronnie G. Penton, Waldon Michael Hingle, Paul Hesse, Ronald J. Favre, Michael Hingle & Associates, Inc., David Vidrine, Mumphrey Law Firm, Alan G. Bouterie, Wayne Joseph Jablonowski, Scott A. Cannon, Law Offices of Scott A. Cannon, LLC, Slidell, LA, Keith Michael Couture, Samuel Beardsley, Jr., Keith Couture Law Firm, Jesse Lee Wimberly, III, Jesse L. Wimberly, III, Eric August Bopp, Walter R. Woodruff, Mandeville, LA, Conrad S. P. Williams, III, Charles Clarence Bourque, Jr., Christopher John St. Martin, Joseph G. Jevic, III, St. Martin & Williams, Houma, LA, Darryl James Becnel, Daniel E. Becnel, III, Daniel E. Becnel, Jr., Matthew B. Moreland, Law Offices of Daniel E. Becnel, Jr., Reserve, LA, N. Madro Bandaries, Wiley J. Beevers, Beevers & Beevers, LLP, Sean D. Alfortish, Law Office of Sean D. Alfortish, Sherif K. Sakla, The Sakla Law Firm, Stephanie C. Reuther, Law Firm of Stephanie C. Reuther, Michelle Ebony Scott-Bennett, Justice for All Law Center, LLC, Gretna, LA, Philip Bohrer, Bohrer Law Firm, Walter C. Dumas, Natashia Carter Benoit, Patti Durio Hatch, Travis J. Turner, Dumas & Associates Law Corporation, Dominick F. Impastato, III, Marc L. Frischhertz, Frischhertz & Associates, Rebecca Cunard, Cunard Law Firm, Leslie A. Cordell, Orrill, Cordell & Beary, Baton Rouge, LA, John Van Robichaux, Jr., Robichaux Law Firm, Mark Dwayne Higdon, Creighton, Richards and Higdon, LLC, Adam Frederick Hutton, Covington, LA, John Randall Whaley, Richard J. Arsenault, Neblett, Beard & Arsenault, Alexandria, LA, Robert M. Becnel, Meghan Becnel Burns, Law Offices of Robert M. Becnel, Kathryn Weekley Becnel, Becnel Law Firm, Laplace, LA, William Eldren Bradley, William E. Bradley Law Firm, LLC, Bryan August Pfleeger, Michael Hingle & Associates, Inc., Hammond, LA, Gordon R. Crawford, Gordon R. Crawford & Associates, Gonzales, LA, Stephen J. Herman, Thibodaux, LA, Salvador E. Gutierrez, Jr., Mary Ann Hand, Gutierrez & Hand, J. Wayne Mumphrey, Mumphrey Law Firm, LLC, Richard A. Tonry, Kim Cooper Jones, Michael Ginart, Jr., Cullen Adair Tonry, Tonry & Ginart, Lance V. Licciardi, Nicosia, Licciardi & Nunez, Gregory S. Duhy, Chalmette, LA, Richard Paul Bullock, Donni Elizabeth Young, Early, Ludwick & Sweeney, New Haven, CT, Casey Carlile, D. Scott Carlile, David Carlile, Carlile Law Firm, Marshall, TX, Mark David Plaisance, Baker, LA, Gary J. Ortego, Ortego & Dupre, Ltd., Ville Platte, LA, James Bradley Guest, Kenner, LA, Clayton Joseph Swank, III, Clayton J. Swank, III, and Associates, APLC, Madisonville, LA, Marion Overton White, Opelousas, LA, for Plaintiffs.

Darleen Jacobs Levy, New Orleans, LA, pro se.

Salvadore Samuel Ruffino, Chalmette, LA, pro se.

George A. Frilot, III, Allen Joseph Krouse, III, Danica Colleen Benbow, Edward F. Kohnke, IV, Kerry J. Miller, Patrick J. McShane, Paul C. Thibodeaux, Frilot, Partridge, Kohnke & Clements, LC, Daniel L. Dysart, E. Windmeyer, LLC, Metairie, LA, for Defendant.

## ORDER & REASONS APPROVING CLASS ACTION SETTLEMENT AND AWARD OF COMMON–BENEFIT FEES AND EXPENSES

FALLON, District Judge.

The Plaintiffs' Steering Committee ("PSC") and Murphy Oil USA, Inc. ("Murphy") have settled this class action litigation involving an oil spill in the days following Hurricane Katrina. Before the Court is the parties' Joint Motion for Final Approval of the Class Action Settlement (Rec.Doc. 1034) and the PSC's Motion for Common Benefit Fees and Expenses (Rec. Doc. 865). The Court has carefully considered the oral arguments made at the fairness hearing held on January 4, 2007, including statements presented by both proponents and objectors to the class settlement. It has also reviewed the written memoranda and supporting documentation submitted by all parties, including numerous affidavits and declarations from PSC members, class representatives, and experts. Lastly, the Court has examined the procedural record and applied its own knowledge of the case accumulated through its active involvement in this litigation since inception.

Accordingly, the Court is fully advised of the matter and is now ready to rule. For the following reasons, the parties' Joint Motion for Final Approval of the Class Action Settlement is GRANTED because the Court finds that the proposed settlement of this class action is fair, reasonable, and adequate. In addition, the PSC's Motion for Common Benefit Fees and Expenses is GRANTED IN PART as provided in this Order & Reasons.

## I. BACKGROUND

### A. Factual Background

On August 29, 2005, Hurricane Katrina made landfall on the Louisiana/Mississippi border, resulting in one of the most devastating natural disasters ever to occur in the United States. As the storm passed over southeastern Louisiana, twenty-foot storm surges rolled into the Mississippi River–Gulf Outlet ("MR–GO") and swept over and breached some fourteen miles of a levee system intended to protect St. Bernard Parish, inundating nearly all of the homes and businesses with massive flood waters.

Among those properties impacted by the flood waters was the Murphy Oil refinery in Meraux, Louisiana. The refinery, owned and operated by Murphy, produced approximately 125,000 barrels of refined petroleum per day. Located on Murphy's property are multiple above-ground tanks used to hold crude oil. These tanks are surrounded by earthen berms, or dikes, built to contain any oil that might escape from the tanks in the event of a leak or spill.

Murphy's Tank 250–2, designed to hold 250,000 barrels of oil, was surrounded by an eight-foot-high earthen dike. Sometime shortly following the overtopping and breaches along the MR–GO levee system, flood waters reportedly up to twelve feet in height swept over, eroded, or traveled through openings in the earthen dike, entering the containment area where Tank 250–2 was located. Though the parties debate the specific facts, time frame, and causes of this incident, there is no dispute that the flood waters quickly surrounded Tank 250–2. The Tank dislodged from its moorings, causing it to float and subsequently rupture. Water entered the Tank due to hydrostatic pressure, and it ultimately began to sink. As flood waters receded and hydrostatic pressure dropped, the crude oil mixture leaked from the Tank and escaped beyond the dike. A significant amount of crude oil escaped from the Tank, spilled into the refinery property, and traveled to the surrounding neighborhood in the days following the hurricane's

arrival, contaminating homes and businesses already saturated with flood waters.

On September 3, 2005, Murphy notified the federal government that the oil spill had been detected. Federal and state environmental regulators quickly traveled to the scene to assess the scope of damage and begin recovery of spilled oil. Murphy undertook a voluntary settlement program with residents of the area neighboring its refinery. It also began cleanup and remediation efforts in public spaces and for homeowners who gave Murphy permission to test and clean their property.

## B. Procedural Background

On September 9, 2005, the first lawsuit regarding this accident was filed against Murphy. Many suits followed. In all of these suits, the Plaintiffs are St. Bernard Parish homeowners and business owners who claim to have suffered damages due to the oil spill. In separate orders dated October 4 and 5, 2005, the Court consolidated the cases that had been filed and provided that all future cases would be automatically consolidated. This litigation now includes twenty-seven consolidated class actions.

The Court appointed a Plaintiffs' Committee on October 4, 2005 and has expanded its membership on several occasions. On October 18, 2005, the Court established the Plaintiffs' Executive Committee to manage the litigation and designated both Plaintiffs' and Defendant's Liaison Counsel. The Court subsequently outlined the procedure for case management stating, among other things, that monthly status conferences would be held in open court which all interested parties could attend and meetings with liaison counsel would take place prior to the monthly conferences. The Court also established a dedicated website for this litigation and posted orders, pleadings, transcripts, and notices for public viewing.[1]

At the request of the Court, the parties jointly compiled a Class Action Administrative Master Complaint, consolidating all claims raised by the Plaintiffs in the various pending lawsuits, and filed it on November 28, 2005 (Rec.Doc. 49). Murphy subsequently filed seven motions to dismiss portions of the Master Complaint pursuant to Rules 12(b)(6) and 12(c) of the *Federal Rules of Civil Procedure.* On December 29, 2005, the Court resolved these motions, dismissing several aspects of the Master Complaint (Rec.Doc. 104).[2] With respect to the remaining claims, the parties engaged in extensive discovery, conducted testing, and took depositions for class certification purposes.

On January 12 and 13, 2006, the Court held a two-day class certification hearing at which counsel presented evidence for and against class certification of the remaining claims. After review of the evidence and expert opinions offered by the parties, the Court certified this matter as a class action pursuant to Rule 23(b)(3). *See Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597 (E.D.La.2006).[3] Based upon where it found the oil flowed, the Court certified a class composed of residents and property owners within the following defined geographic area:

> All persons and/or entities who/which have sustained injuries, loss, and/or

---

1. The website is located at *http://www.laed. uscourts.gov/MurphyOil/MurphyOil.htm.*

2. Specifically, the Court dismissed as premature the Plaintiffs' claims under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* The Court also dismissed the Plaintiffs' claims for fear of cancer damages and struck the class action allegations relating to fraud.

3. Phyllis N. Michon, Cherie Scott Perez, James Shoemaker, Fernand Marsolan, and Robin Diaz Clark were named class representatives.

damages as a result of the September 2005 spill of crude oil and any other related substances from a storage tank located on Defendant Murphy Oil USA, Inc.'s property in Meraux, Louisiana, and who/which on August 29, 2005, were residents of, or owned properties or businesses in, the following area: Beginning north, from the 40 Arpent Canal with its intersection in the west at Paris Road in Chalmette, Louisiana, and traveling along Paris Road in a southerly direction to its intersection with St. Bernard Highway, then heading east from this intersection along St. Bernard Highway to Jacob Drive, then heading north along Jacob Drive to the intersection with East Judge Perez Drive, then heading east along East Judge Perez Drive to its intersection with Mary Ann Drive, then heading north along Mary Ann Drive to the 40 Arpent Canal.[4]

Specifically, the Court certified Counts I, II, IV, V, and VII of the Administrative Master Complaint for class-wide treatment, which included the following claims: negligence pursuant to Louisiana Civil Code article 2315, absolute liability pursuant to Louisiana Civil Code articles 667 and 2315, strict liability pursuant to Louisiana Civil Code articles 2317 and 2322, nuisance and trespass pursuant to Louisiana Civil Code articles 3421 and 3425, and groundwater contamination pursuant to Louisiana Revised Statutes § 30:2015.1.[5]

Given the need to protect class members' rights and to avoid any possibility of confusion, on February 6, 2006, the Court directed that the "best notice practicable" of class certification be distributed to class members pursuant to Rule 23(c)(2). *See Turner v. Murphy Oil USA, Inc.*, No. 05–4206, 2006 WL 286009 (E.D.La. Feb.6, 2006); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Court found it appropriate to permit class members to opt out of the class action litigation at this stage and ordered that the notice must contain a provision informing class members that they would be afforded the opportunity to opt out of the lawsuit.

On March 3, 2006, the Court adopted a trial plan for this class action, bifurcating the trial into two different phases (Rec. Doc. 257). Phase One would address common issues of liability and general causation; Phase Two would consist of successive trials on specific causation and compensatory damages. However, Phase Two would only take place if a jury found Murphy liable in whole or in part in Phase One.

4. The Court found that the class satisfied the requirements set forth in Rule 23(a) of the *Federal Rules of Civil Procedure* because the class was so numerous that joinder of all Plaintiffs was impracticable, there were questions of law and fact common to the class, the claims and defenses of the class representatives were typical of the claims of the class as a whole, and both class representatives and counsel for the Plaintiffs would fairly and adequately protect the interests of the proposed class. *See Turner,* 234 F.R.D. at 603–05. The Court held that the class action was to be maintained pursuant to Rule 23(b)(3) of the *Federal Rules of Civil Procedure*, as questions of law or fact common to the class predominated over questions affecting individual members and the class action vehicle was superior to any other method for the fair and efficient adjudication of the matter. *See id.* at 605–10.

5. The Plaintiffs sought an array of damages, including actual and punitive damages allowed under the common law; damages or payments for remediation of groundwater; compensatory damages and attorneys' fees for injuries including contamination of property, cost of homogenous restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, past and future medical expenses; and injunctive relief.

Phase One of the trial was scheduled to commence on October 2, 2006. However, on September 25, 2006, the trial was cancelled because the parties reported to the Court that they had come to an amicable resolution of the case and had signed a Memorandum of Understanding to this effect (Rec.Doc. 588). On October 9, 2006, the parties presented a Final Settlement Agreement and Notice Program to the Court (Rec.Doc. 742), which was preliminarily approved on October 10, 2006 (Rec. Doc. 731), pending a fairness hearing noticed to all class members.

As part of the Settlement Agreement, all of those who had previously opted out of the class following certification, but did not settle with Murphy, were permitted to rejoin or opt back into the Plaintiff class. (Settlement Agreement 18.) Additionally, those who resided, leased, or owned property or businesses in a designated Buyout Zone, regardless of any prior settlement with Murphy, were also allowed to opt back in to obtain certain benefits under the Settlement Agreement. *Id.* The Court permitted these opt-outs to rejoin the Plaintiff class until December 8, 2006. The Court also permitted class members to file objections to the settlement program by December 15, 2006. The Court ordered that all objections were to be filed into the record and that the objectors would be given an opportunity to be heard at the fairness hearing. The Court appointed Judge Robert Klees (Ret.) of the Louisiana 4th Circuit Court of Appeal as Special Master to assist in resolving any objections or allocation disputes, and it appointed disbursing and administrative agents to assist with the administration of claims.

## C. The Settlement Agreement

According to the terms of the Settlement Agreement, the total value of the settlement is currently estimated at $330,126,000 and can be broken down into four main categories of compensation for damages related to the crude oil spill.

The first category is a buyout program. Murphy is required to spend $55 million toward purchasing and remediating properties in a "Buyout Zone," which is comprised of class member properties adjacent to the oil refinery that suffered the most extensive contamination.[6] In the event that Murphy does not exhaust the $55 million in the Buyout Zone by June 30, 2007, it will acquire other properties in the class area until this fund is exhausted.

The second category is a compensation program. Murphy is required to distribute $120 million to all residents and owners of properties within the class area, including those within the Buyout Zone, pursuant to an allocation plan approved by the Court (Rec.Doc. 802). Buyout Zone class members are not required to sell their property to Murphy under the buyout program in order to participate in the compensation program. The allocation plan divides the class area into four zones and provides that the level of compensation paid to class members depends upon the zone in which they live or own property, the total square footage of property, the number of persons who live at the property, and the estimated commercial loss.[7] These zones were designed accord-

---

6. Specifically, the Buyout Zone includes the area between the north side of St. Bernard Highway and the south side of the 20 Arpent Canal, on the first four streets and corresponding cross-streets west of the refinery, i.e., both sides of Jacob Drive, Despaux Drive, Ventura Drive, and Lena Drive, including Ohio Street (both sides from Lena to the refinery), Missouri Street (both sides from Lena to the refinery), and East Judge Perez Drive (both sides from Lena to the refinery). (Settlement Agreement 5.)

7. The Court will discuss the specific monetary amounts awarded under the compensation

ing to the level of oil contamination on properties and after extensive review of property records and input from environmental, technical, and scientific experts.

The third category acknowledges past compensation, recognizing that $83,264,000 has been paid, exclusive of remediation, through Murphy's voluntary settlement program.

The fourth and final category is a remediation program. As of the date of the Settlement Agreement, $51,862,000 has been expended in remediation costs and it is estimated that an additional $20 million will be spent on future remediation in the class-wide area beyond the Buyout Zone. The class area will be remediated pursuant to a plan approved and overseen by federal and state regulatory authorities and subject to this Court's review.[8] Under the plan, Murphy and its contractors will test and remediate building interiors, exterior structures, and yards until government regulators or the Court determines that the clean-up is sufficient. Thus, Murphy could conceivably be required to spend more than the estimated $20 million in future remediation costs.

To receive the designated settlement award, class members are required to submit a proof-of-claim form and agree to release all claims against Murphy. Murphy is not required to accept liability or otherwise make any admissions of wrongdoing for the oil spill.

Lastly, the Settlement Agreement provides that all administrative costs of the class settlement, all common-benefit fees,

and all common-benefit expenses incurred in connection with prosecuting this litigation will be paid by Murphy.[9]

## D. Notice

■ The Court's October 10, 2006 Order preliminarily approving the class settlement required dissemination of a legal notice of the settlement to individual class members, including notice of the opportunity to rejoin the class for those parties who previously opted out. According to Rule 23(e), the notice must be given "in a reasonable manner." Fed.R.Civ.P. 23(e)(1)(B). "There are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements...." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 114 (2d Cir.2005), *cert. denied,* 544 U.S. 1044, 125 S.Ct. 2277, 161 L.Ed.2d 1080. In some circumstances, reasonable notice may require individual notice in the manner required by Rule 23(c)(2)(B). *See* Fed.R.Civ.P. 23 advisory committee's note. Rule 23(c)(2)(B) provides in part:

> For any class certified under Rule 23(b)(3), the court must direct to class members the *best notice practicable under the circumstances,* including individual notice to all members who can be identified through reasonable effort.

Fed.R.Civ.P. 23(c)(2)(B) (emphasis added); *see also Eisen,* 417 U.S. at 173–77, 94 S.Ct. 2140 (elaborating on the constitutional dimension of notice under the Due Process Clause). However, *actual* notice to each

---

program in Part II.B.5 of this Order & Reasons.

**8.** The remediation plan, otherwise labeled the "closure plan" in Court documents, was approved by the Environmental Protection Agency, the Louisiana Department of Environmental Quality, the Agency for Toxic Substances and Disease Registry, and the Louisiana Department of Health and Hospitals.

The plan is available at *http://www.laed. uscourts.gov/MurphyOil/Forms/Forms.htm* (Settlement Agreement Ex. 2).

**9.** The Court discusses the implications of these provisions in greater detail in Parts II. B.1 and III.A of this Order & Reasons.

party that would be bound by the adjudication of the class action is not required. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "A construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified." *Id.* Therefore, when courts have evaluated whether settlement notice is adequate, the focus is not on actual notice rates, but rather whether the best notice practicable to individuals under the circumstances was achieved through reasonable effort. *See DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 944 (10th Cir.2005) (citing *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110–11 (10th Cir.2001), and *Eisen*, 417 U.S. at 174, 94 S.Ct. 2140). To state it another way, "the question is ... not whether some individual ... got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993); *see also DeJulius*, 429 F.3d at 945–47.

At the outset, it is important to note the unique challenges that counsel in this case faced in providing reasonable notice to class members that complied with due process requirements. Most of the putative class members were displaced following Hurricane Katrina. The class-wide area received little or no mail service for some time following the storm. Many class members have yet to return to their homes and are scattered in different areas, though most have established residences in southeastern Louisiana and Mississippi.

With this challenge in mind, the parties prepared a notice plan designed to reach the class members wherever they might reside. The parties retained Todd Hilsee of Hilsoft Notifications to ensure that adequate notice was given to class members in light of the unique challenges presented in this case.[10] The Court reviewed and made changes to the content and form of the notice and monitored the procedure used to disseminate the notice. Three primary methods were used to circulate the notice to class members: direct mail, newspaper publication, and the Internet. The first mailing following execution of the Settlement Agreement included a Decision to Rejoin Package ("DRP") targeted to those who previously opted out of the class to inform them of an opportunity to rejoin. Over 1,300 packages were mailed to 307 class area addresses and 280 class area properties,[11] and 777 packages were mailed to 41 law firms representing clients for approximately 300 properties that had opted out of the class. Remailings were also sent to updated current addresses. Only two class area addresses representing two class area properties did not receive a DRP after completion of all DRP mailings and remailings. Although the actual rate

---

**10.** Mr. Hilsee is a highly regarded expert in class action notice who has extensive experience designing and executing notice programs that have been approved by courts across the country. Furthermore, he has handled notice plans in class action cases affected by Hurricanes Katrina, Rita, and Wilma, *see In re High Sulfur Content Gasoline Products Liability Litigation*, MDL 1632, p. 15–16 (E.D.La. Sept. 6, 2006) (Findings of Fact and Conclusions of Law in Support of Final Approval of Class Settlement), and has recently published an article on this very sub-

ject, *see* Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire to Inform" Requirement for Effective Class Notice is Highlighted by Katrina*, 80 Tul. L.Rev. 1771 (2006) (detailing obstacles and solutions to providing effective notice after Hurricane Katrina).

**11.** Class area addresses differ from class area properties due to multi-unit housing and vacant lots (Affidavit of Todd B. Hilsee, ¶ 27 & n. 9).

of notice is not the deciding factor in determining whether notice was adequate, it is worth mentioning that only 0.6% of the class area addresses or 0.07% of class area properties unrepresented by attorneys did not receive the package, signifying a successful mailing rate.

Second, a Settlement Notice Package ("SNP"), which included a summary of the settlement, the notice and a summary of the notice, the class area map, the proof-of-claim form, and an envelope, was sent to all class members and others who had not settled claims with Murphy through its voluntary settlement program after the Court issued the Order of Preliminary Approval. Over 6,600 of these packages were sent to 3,658 class area addresses and 3,321 class area properties. After subsequent remailings to updated current addresses, approximately 80% of the total number of individual addresses within the class area received the SNP.

Third, 5,147 Supplemental Mailing Packages ("SMP") with information concerning the allocation plan, fee requests, and remediation plan were sent to 2,635 class area addresses and 2,447 class area properties to reach class members who had not filed proof-of-claim forms. Only 187 class area addresses representing 170 class area properties that had not yet filed proof-of-claim forms did not receive the SMP.

To reach remaining class members whose current addresses were unknown, notice of the settlement was also published in 10 newspapers circulated on a local basis or within areas of proximity to St. Bernard Parish where class members were believed to have relocated. Notice was published in each of these newspapers on two occasions within a short time frame (the earliest notice occurred on October 29, 2006, and the latest on November 15, 2006). To reach the remaining 10% to 15% of St. Bernard residents dispersed throughout several states, notice of the

settlement was published in USA Today, which has a nationwide circulation. Mr. Hilsee states that these newspaper publication efforts provided notice to an estimated 60% to 80% of the class members (Affidavit of Todd B. Hilsee, ¶ 67).

Class members were also provided notice of the settlement and access to settlement documents through the Court's website for the litigation, www.laed.uscourts.gov, and Murphy's website, www.murphyoilcorp.com. Furthermore, St. Bernard Parish's website, www.sbpg.net, also posted information about the spill, the class action lawsuit, and the settlement process.

Lastly, this litigation and resulting settlement plan has received significant coverage in both the local and national press since the parties executed the Memorandum of Understanding on September 25, 2006. Mr. Hilsee states that, based on research data received from media consulting firms, adults were exposed to information about the class action settlement more than 9.9 million times due to newspaper articles alone (Affidavit of Todd B. Hilsee, ¶ 56). Local television and radio coverage of the proposed settlement has also been consistent.

Through these numerous methods, notice was targeted to individual class members to inform them of the pendency of the action, the proposed settlement, the settlement terms and conditions, their interest in the settlement, the manner of distribution of proceeds, the date and time of the fairness hearing, and their right to object. As such, the Court finds that the parties used more than reasonable efforts to achieve the best notice practicable under the circumstances, thereby complying in all respects with Rule 23 and due process requirements. All of the above actions lead the Court to conclude that the class members received due and adequate notice

in compliance with the Court's order preliminarily approving the settlement and that these actions constituted the most reasonable manner of notice under Rule 23(e)(1)(B).

### E. Settlement Administration

In order to assist class members, the parties established a claims center in Chalmette, Louisiana. Claims office attorneys have assisted class members in opting back into the class, filing claim forms, obtaining legal documentation in support of claims, and filing objections. The Court designated Global Risk Solutions to serve as the Disbursing Agent to disburse payments to class members in accordance with the Settlement Agreement. The Court appointed Bourgeois Bennett, L.L.C. to perform accounting functions on behalf of the PSC regarding the Disbursing Agent's services. Lastly, as previously mentioned, the Court also appointed Retired Judge Robert Klees as Special Master to assist in resolving allocation disputes and objections. Pursuant to the Settlement Agreement, these parties will be compensated by Murphy for their services.

## II. FAIRNESS OF THE SETTLEMENT AGREEMENT

Before approving a class settlement that binds members of the class, the Court must conduct a fairness hearing at which the parties proposing the settlement must present evidence that the settlement is "fair, reasonable, and adequate." Fed. R.Civ.P. 23(e)(1)(C); *see also Newby v. Enron Corp.*, 394 F.3d 296, 300–01 (5th Cir.2004); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982). Accordingly, on January 4, 2007, the Court held a fairness

hearing to determine whether it should grant final approval of the settlement program in this case.

At the hearing, the Court heard arguments from proponent counsel, Special Master Judge Klees, two objectors, and the Governor of Louisiana, Kathleen Babineaux Blanco, who appeared before the Court to express support for the class settlement and confirm that any class settlement awards would not be deducted from amounts class members might receive from the Louisiana Recovery Authority's Road Home Program.[12] The Court also ordered that the affidavits and declarations of class counsel, class representatives, and experts as to the fairness, reasonableness, and adequacy of settlement be offered into evidence and made part of the record.

### A. Legal Standard for Review of Class Action Settlements

The Court must be exacting and thorough in analyzing whether the settlement is in the best interests of class members, *Manual for Complex Litigation (Fourth)* § 21.61 (2004), and should provide the basis for its conclusions in a reasoned opinion. *See In re Combustion, Inc.*, 968 F.Supp. 1116, 1125 (W.D.La.1997) (stating that a court may not give boilerplate approval to settlement, but must instead analyze the facts and law supporting its conclusion in a memorandum); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 356, 163 L.Ed.2d 64. It has been remarked that the district court takes on the role of fiduciary for absent class members, or that

---

**12.** The Road Home program is a housing recovery program funded by the U.S. Department of Housing and Urban Development and run by the Louisiana Office of Community Development designed to help residents of Louisiana affected by Hurricanes Katrina and

Rita get back into their homes as quickly and fairly as possible by offering eligible homeowners grants of up to $150,000. *See* The Road Home, *http://www.road2la.org* (last visited Jan. 29, 2007).

of a skeptical client, who critically examines the settlement's terms and implementation. *See Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.2002); *Georgevich v. Strauss,* 96 F.R.D. 192, 196 (M.D.Pa.1982) ("[T]he Court must vigorously act as guardian of the rights of absentee class members."); 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1:3 (4th ed.2002); *Manual for Complex Litigation* § 21.61. Indeed, the district court must "exercise the highest degree of vigilance in scrutinizing the proposed settlement." *Reynolds,* 288 F.3d at 279–80.

■■■ When evaluating a proposed settlement, the Court must compare its terms with the rewards the class would likely receive following a trial and judgment in its favor. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). However, the merits of the case are not at issue during the settlement review process. *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983). Otherwise, a primary goal of settlement—to avoid the expense and delay of trial—would be thwarted. *See id.* (citing *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)). The Court is also limited in that it may not make unilateral modifications or alterations to the proposed settlement, but rather may only accept or reject the agreement as a whole. *See Evans v. Jeff D.,* 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747; *see also* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.5 & n. 9 (3d ed.2005); *Manual for Complex Litigation* § 21.61. The Court may not resolve contested issues of fact or law, but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation.

■■■ Though Rule 23 does not elaborate specific factors necessary for settlement approval, the United States Court of Appeals for the Fifth Circuit has cited six factors that a district court should take into consideration when evaluating a proposed class action settlement. These factors, or "focal facets," include:

(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the absent class members.

*Reed,* 703 F.2d at 172 (adopting six-factor test cited in prior Fifth Circuit decisions including *Parker,* 667 F.2d at 1209, and *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978)); *see also In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 217 (5th Cir. Apr.1981).

The Court will consider these six factors, taking into account the statements by counsel, class representatives, and objectors; the Court's own knowledge of the litigation obtained from its management and involvement in the case over the past year; and any recommendations provided by the Special Master. Before beginning an analysis, it is relevant to note that there is a "strong judicial policy favoring the resolution of disputes through settlement" and that a presumption is made in favor of the settlement's fairness, absent contrary evidence. *Smith v. Crystian,* 91 Fed. Appx. 952, 955 (5th Cir.2004) (quoting *Parker,* 667 F.2d at 1209); *Cotton,* 559 F.2d at 1331. The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses. *See Cotton,* 559 F.2d at 1331; *In re: Train Derailment Near Amite La.,*

MDL 1531, 2006 WL 1561470, at *11 (E.D.La. May 24, 2006) ("But for amicable resolution of this class action by compromise ... its disposition would almost certainly have been a complicated, lengthy, and exceedingly expensive enterprise."). Ultimately, however, the proponents of the settlement bear the burden of demonstrating that the settlement is fair, reasonable, and adequate. *See* Wright, et al., *supra*, § 1797.1; *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983); *Foster v. Boise–Cascade, Inc.*, 420 F.Supp. 674, 680 (S.D.Tex.), *aff'd*, 577 F.2d 335 (5th Cir.1978). With this in mind, the Court will now turn to the six *Reed* factors.

## B. Analysis of the *Reed* Factors

### 1. *Fraud or Collusion*

■ A strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion. *See Wal–Mart Stores*, 396 F.3d at 116–17; 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41 (4th ed.2002). The suspicion of fraud and collusion is sometimes suggested by agreements of counsel regarding attorneys' fees. In private disputes such as the present case, class counsel have historically been compensated with a fee award taken directly out of the settlement fund. *See, e.g.*, William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class–Action Litigation*, 23 J. Legal Stud. 185, 186 (1994). While the recovery of such "common benefit" fees from class members is based in equity, such a procedure can create a perceived or actual conflict of interest and may lead to claims of collusion. Courts and counsel have thus implemented alternative arrangements in an effort to combat the possibility of such appearances.

It is common practice today for class counsel to negotiate a specific fee award after they have successfully negotiated the class's recovery. *See, e.g., In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 803 (3d Cir.1995); *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, MDL 991, 1995 WL 222177, at *4 (E.D.La. Mar.15, 1995) ("Separate negotiation of the class settlement before an agreement on fees is generally preferable to avoid conflicts of interest between the attorneys and the class."). In addition to specifically negotiated fees, courts have been presented with class action settlements that include "clear-sailing clauses," in which the defendant agrees not to contest a court-awarded fee up to a certain amount. In both instances, it is increasingly common for class action settlements to provide that such fees are to be paid separately by the defendant, that is, over and above the class's recovery, rather than subtracted from the common benefit fund.

But even these alternative arrangements have their skeptics. For example, the United States Court of Appeals for the Third Circuit noted that the first edition of the *Manual for Complex Litigation* "condemned fees that are paid separate and apart from the settlement funds paid to the class because amounts paid by the defendant(s) are properly part of the settlement funds." *In re GMC*, 55 F.3d at 802–03; *see also Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir.2003) ("That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award."). A task force commissioned by the Third Circuit explained the rationale driving this skepticism: "Since the defendant is interested only in the total size of its liability, so long as the settlement is accepted, it often will be indifferent as to the division of the fund between the plain-

tiffs' recovery and the attorneys' fees." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 266 (1985). The United States Court of Appeals for the First Circuit has also spoken on the issue:

> While the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery, there is also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.

*Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 524 (1st Cir.1991).[13]

In class actions where the attorneys' fee is negotiated by counsel, courts "must be particularly vigilant in evaluating [class counsel's] recommendations because there may be a bias toward settlements in which the class attorney agrees to trade off a smaller total award by the defendant for a larger fee." Wright, et al., *supra,* § 1797.1; *see also* Kent A. Lambert, *Class Action Settlements in Louisiana,* 61 La. L.Rev. 89, 102–04 (2000) (noting that "mixing negotiation of the overall settlement with discussions of attorneys' fees" can, at a minimum, create "an appearance of impropriety"). Pecuniary self-interest of

class counsel has long been cited by courts and scholars as a threat to performance of counsel's professional and fiduciary obligations to class members. *See, e.g., Reynolds,* 288 F.3d at 279–80; John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 Colum. L.Rev. 370, 385–93 (2002); David L. Shapiro, *Class Actions: The Class as Party and Client,* 73 Notre Dame L.Rev. 913, 958–60 & n. 132 (1998).

The proposed settlement before this Court is unique, however, in that not only are attorneys' fees and expenses to be paid by Murphy over and above the class recovery, but the amount of the fee is left entirely to the Court's discretion. As previously noted, this is significant because it exponentially decreases the possibility of collusion among counsel. Because the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining. *See, e.g.,* Bruce L. Hay, *The Theory of Fee Regulation in Class Action Settlements,* 46 Am. U.L.Rev. 1429, 1432 (1997) ("[P]roper regulation of the counsel's fee is both necessary, and within limits, sufficient to mediate the tension between the goals of facilitating settlement and protecting the class against collusion.").[14]

---

**13.** It should also be noted that "clear-sailing clauses," which are essentially nothing more than negotiated ceilings on fee awards, have also been subjected to criticism. *See, e.g.,* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements,* 77 Tul. L.Rev. 813 (2003) (arguing that courts should reject class action settlements containing clear sailing clauses).

**14.** The presence of both of these characteristics in a class action settlement agreement—payment of the fee by the defendant *and* the absence of any bargaining or discussion about

the amount of fee—significantly reduces the likelihood (and appearance) of fraud or collusion. Given the "economic reality that a settling defendant is concerned only with its total liability," it is easy to see how a negotiated fee award, even if it is to be paid separately by the defendant, does not eliminate the potential for collusion. *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 849 (5th Cir. 1998). In these circumstances, "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Prandini v. Nat'l Tea Co.,* 557 F.2d 1015, 1020 (3d Cir.1977). "Even if the plain-

Finally, a presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212. As discussed below, the Court believes that the quality and comprehensiveness of the benefits provided to class members under the Settlement Agreement adequately compensate the class members. Class counsel are skilled attorneys who have extensive experience with this type of case and have used this knowledge at the bargaining table to conduct arms-length negotiations. Moreover, counsel for both sides engaged in vigorous advocacy, as evidenced by the extensive discovery, expert consultations, and motion practice in this case. Thus, settlement was achieved in the full context of the adversarial process. The Court monitored and often participated in the negotiation process and was fully informed of the developments leading up to settlement achievement. The Court, therefore, concludes that the proposed settlement was negotiated by the parties absent any fraud or collusion.

### 2. Complexity, Expense, and Likely Duration of the Litigation

■ The complexity, expense, and likely duration of the litigation make the option of settlement a far better alternative in this case than proceeding to trial. As the Court stated at the fairness hearing, this class action litigation would ordinarily have taken five or more years to complete. Moreover, the Plaintiffs' claims and Murphy's defenses are complex and require a high degree of scientific and technical skill and knowledge, making discovery particularly expensive in light of the tests and experts required to successfully litigate the case. Approximately 3,800 properties are represented by the class representatives in this class action litigation. If a jury had determined that Murphy was indeed fully or even partially liable for the spill, the litigation regarding individual damages could have taken years to resolve and would have greatly increased the costs and fees associated with both prosecuting and defending the litigation. Moreover, an appeals process, if utilized, would add additional time and considerable expense and delay to the receipt of any relief afforded.

From the inception of litigation, the Court has recognized that speedy resolution of this case was imperative because of the critical situation that many of the Plaintiff class members have faced since Hurricane Katrina. The storm completely devastated St. Bernard Parish, which has always been a tight-knit community. Many residents continue to remain displaced and are unable to return to their homes. Compensation now rather than later is an important step in affording class members the means to rebuild their neighborhood. Moreover, remediation efforts are critical in creating a safe environment for residents. Recognizing the desire of the St. Bernard community to return to their homes and businesses, the Court believes that the impact of settlement will significantly aid their road to recovery and return to normality.

### 3. Stage of the Proceedings and Amount of Discovery Completed

■ The stage of the proceedings and the nature and extent of discovery can be significant factors in evaluating the fair-

tiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations. And, in any event, there is an appearance of a conflict of interest." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 266 (1985).

ness of a settlement. Although it is not essential that all or nearly all discovery be complete in order for a court to conclude that this factor supports a finding of fairness, *see In re Corrugated Container Antitrust Litig.*, 643 F.2d at 211, it certainly strengthens the argument for approval of settlement. In this case, the parties executed the Memorandum of Understanding on September 25, 2006, approximately one week before the Phase One trial on liability was scheduled to begin. The Settlement Agreement was executed on October 9, 2006, and preliminarily approved by the Court on October 10, 2006. Since settlement was achieved so close to the trial date, discovery was basically complete and the parties were able to evaluate the class members' claims and conduct informed bargaining. *See In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.*, 447 F.Supp.2d 612, 620 (E.D.La.2006) ("[T]he question is ... whether the parties have obtained sufficient information about the strength and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case. . . .").

The record reflects the following discovery efforts by the parties:

- Approximately 52 motions were extensively briefed and filed by both sides and many of these motions were heard with oral argument.
- An estimated 87 depositions were conducted.
- The PSC engaged approximately 18 experts in various scientific and technical fields.
- Murphy retained 10 experts regarding the liability phase of the trial.
- The PSC interviewed numerous fact witnesses who were in St. Bernard Parish before and/or during Hurricane Katrina and met with the United States Coast Guard on several occa-

sions to obtain video and photographic evidence of the spill's effects.

- The PSC, in conjunction with experts, caused 830 soil, sediment, water and/or air samples to be taken from the class area to obtain information on the nature and extent of the spill. Murphy has collected and analyzed approximately 16,375 samples from 5,413 addresses with agency oversight, and the EPA has collected and analyzed approximately 911 split samples.
- The PSC drilled 15 monitoring wells and took numerous samples from these wells to attempt to confirm the extent of groundwater contamination from the spill, and it conducted subslab testing in several class area homes to confirm whether any toxins were being emitted.
- The PSC created extensive and sophisticated computer graphics on issues such as tank gravitation, weather advisories, mechanisms of tank floating, rupturing and spilling crude oil, and test results in class boundaries.
- The PSC took samples from Tank 250–2 for a full metallurgical analysis and attended the dismantling and demolition of Tank 250–2 in order to preserve evidence of location and condition of the tank, and its floating roof and bottom for trial.
- The PSC and Murphy engaged in formal mediation conducted by an experienced mediator on March 24 and 25, 2006.

Thus, from a review of the extensive discovery record and considering that the pending Phase One trial was to occur little more than one week before resolution was achieved, the Court finds that the parties were fully informed of the factual and legal obstacles presented and possessed more than sufficient information to determine

that settlement was preferable to looming litigation.

### 4. Probability of Plaintiffs' Success on the Merits

█ A court's determination, or even evaluation, of whether any factual or legal issues exist that could prevent or otherwise hinder success on the merits at trial produces somewhat of a tension against the prohibition of trying the case in the settlement hearings. *See Reed*, 703 F.2d at 172; *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (stating that courts must not resolve the merits of the case or unsettled legal questions when weighing the likelihood of success on the merits against settlement form and amount). Nevertheless, absent fraud or collusion, the probability of the plaintiffs' success on the merits has been held by the Fifth Circuit as the most important *Reed* factor. *See Parker*, 667 F.2d at 1209. Thus, the Court now turns to this issue.

The certified claims asserted in the Administrative Master Complaint—negligence, liability of a landowner for activity that deprives his neighbor of enjoyment or causes damages, strict liability, nuisance and trespass, and groundwater contamination—all relate to property damage that the Plaintiff class members allegedly suffered when oil spilled onto their properties. As revealed by numerous tests conducted at class members' properties and uncontroverted visual evidence, there is no doubt that oil belonging to Murphy's Tank 250–2 spilled onto many of these properties. Thus, proving that the crude oil damaged the Plaintiff class members' properties would not be difficult; therefore, the Plaintiffs possessed strong claims for nuisance, trespass, groundwater contamination, and liability of a landowner for activity depriving a neighbor of enjoyment or causing damages. There was also strong evidence that Murphy did not follow its own hurricane protection procedures, which allowed the tank to float and subsequently rupture, suggesting that a jury could have found in the Plaintiff class members' favor on the issue of negligence as well.

Nevertheless, balanced against these factors weighing in the Plaintiffs' favor are significant factual and legal obstacles that could have substantially reduced their probability of success on the merits, or minimized their recovery even if successful on the merits. The principal issue to be decided at the Phase One trial was Murphy's fault and whether that fault was a legal cause of the oil spill. Through numerous pre-trial motions, the PSC indicated that it planned to take the position at trial that Murphy's actions constituted the sole cause of the spill because Murphy allegedly failed to comply with its own hurricane protection plan and/or accepted industry and safety standards regarding protection of oil refinery storage tanks located in flood zones (Rec. Docs. 322, 528, & 529). Murphy's stance throughout the proceedings has been to deny any fault on its part and argue that all fault for the oil spill belonged solely to natural causes and actions or inactions of the United States Army Corps of Engineers ("Corps"), who designed, constructed, and maintained the levee system along the MR–GO (Rec. Docs. 347, 543, & 567). It remains Murphy's position that Tank 250–2 would not have floated and the containment dike that surrounded the oil tank would not have been damaged, but for the dike's breach by flood waters, which caused the release of oil beyond the containment area and into the surrounding neighborhood. Murphy alleges that the catastrophic flooding was caused by the levee failures, which directly resulted from either natural causes or the Corps' negligent construction, design, and maintenance. In short, Murphy's position was that the cause of

the Plaintiffs' damage was not the release of oil from Tank 250–2, but the release of oil from the containment dike surrounding the Tank, and that this latter release was due entirely to the destruction of the dike by flood waters, which, in turn, was due to the storm or the Corps' negligence.[15]

The Corps was not brought into this litigation by either party, due to its potential immunity from direct liability under the doctrine of sovereign immunity. *See Loeffler v. Frank,* 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (recognizing that the United States is immune from suit, and that the courts lack jurisdiction to entertain any action against it unless it expressly waives its sovereign immunity); *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,* 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *Humphries v. Various Fed. USINS Employees,* 164 F.3d 936, 941 (5th Cir.1999); *Williamson v. U.S. Dep't of Agric.,* 815 F.2d 368, 380 (5th Cir.1987) (stating that if a plaintiff brings suit against a federal agency or a federal official acting in his or her official capacity, the claim is designated as a claim against the United States and will be barred absent an express waiver of sovereign immunity). However, Murphy contended that it was entitled to assert the fault of the Corps as an affirmative defense under Louisiana law, regardless of the Corps' non-party status and potential immunity from suit. Indeed, article 2323 of the Louisiana Civil Code provides that the percentage of fault must be determined for all parties that caused or contributed to the loss, regardless of whether or not they are parties to the suit and regardless of immunity by statute. Although the Memorandum of Understanding was executed by the parties before the

Court decided whether the Corps' fault should be excluded from the Phase One trial, the Court notes that even if the jury had found both Murphy and the Corps negligent, Murphy would likely have been entitled to have its percentage of fault reduced by the amount for which the Corps was found liable, reducing the damages recoverable by class members.

Furthermore, if the litigation had proceeded to Phase Two and Murphy was found liable in whole or in part, the Court would have had to determine which damage was due to the storm surge and which was due to the oil spill, since homes were already saturated with flood waters at the time of the oil spill. Murphy would not have been required to compensate class members for flood damage, as it did not cause the flooding of class members' properties. Thus, establishing liability and the amount of damages at trial could have been problematic for the Plaintiffs.

These legal and factual obstacles presented a considerable threat to the Plaintiffs' success on the merits and support a finding that settlement was preferable to litigation.

### 5. *Range of Possible Recovery*

■ "[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion...." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972). Thus, after determining if any legal or factual obstacles exist, a district court must make an inquiry into whether the settlement's terms fall within a reasonable

---

**15.** To negate Murphy's argument that it had implemented an effective containment system, the PSC argued that the dike surrounding Tank 250–2 was compromised before the oc-

currence of Hurricane Katrina and that the most significantly breached area was at a location where a pipe connected to Tank 250–2 passed through the dike.

range of recovery, given the likelihood of the plaintiffs' success on the merits. When considering this factor, the Court must remain aware that

> [c]ompromise is the essence of settlement and the court should not make the proponents of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of which concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.

*Nelson v. Waring,* 602 F.Supp. 410, 413 (N.D.Miss.1983) (quoting *Cotton,* 559 F.2d at 1330).

As noted, the Settlement Agreement calls for the settlement award to be allocated to class members based on an allocation plan. The allocation plan requires the entire class area to be divided into four geographic "Zones." These Zones were created after extensive environmental sampling by experts hired by the PSC, Murphy, and governmental regulators; a comprehensive review of property records; and multiple quantitative analyses performed by a local public accounting firm, real estate and economic experts with specialized knowledge of the St. Bernard real estate market, and the Court-appointed Disbursing Agent. After several armslength discussions between counsel regarding the creation of the four Zones, the Court approved the allocation plan (Rec. Doc. 802). Thus, these Zones were not arbitrarily established, but are the result of thoughtful and comprehensive evaluation of the class area.

The Settlement Agreement provides that Murphy must spend $55 million on the purchase of properties within the Buyout Zone, the area containing the majority of highly impacted properties closest to Tank 250–2's location (Affidavits of Marco Kaltofen, P.E., Paul H. Templet, Glenn C. Millner, Ph.D.). The intent of the buyout program is thus to create a buffer zone between the Murphy Oil refinery and the community and remove the most heavily contaminated properties from residential use. Owners of commercial properties will also be offered the option of buyout.

Under the program, Murphy will offer to purchase all residential properties in the Buyout Zone at a rate of $40.00 per square foot. Real estate studies indicate that the price per square foot in the Chalmette area for storm-surge damaged homes declined on average $50.57, or 64.9%, from $77.95 in 2005 to $27.38 in 2006 (Affidavit of Wade R. Ragas, Ph. D., MAI, ¶ 30). This decline in price reflects the typical cost to repair the significant damage caused by Hurricane Katrina and does not include the impact of oil. *Id.* Current housing prices for homes within the Buyout Zone, where storm surge and oil spill damage combined, range from $25 to $40 per square foot of living area. *Id.* at ¶ 34. Thus, the $40 per square foot offered to Buyout Zone property owners represents the very upper end of current market value (Affidavit of John A. Kilpatrick, Ph. D., MRICS, ¶ 7). Furthermore, class members within the Buyout Zone are not required to participate in the buyout program in order to receive the other settlement benefits of monetary compensation and remediation, and if Murphy does not use all of the $55 million for acquisition of properties within the Buyout Zone, it is required to use the remaining amount to purchase other properties in the class area. Based on these features, the Court finds that the buyout program offers considerable value to class members.

Second, each and every class member stands to gain from Murphy's agreement to financially compensate the class. The total amount of compensation to be distributed to class members is $120 million. The amount of compensation each individual class member will receive depends

upon the Zone in which they reside or in which they own property, the total square footage of property, the number of persons who reside at the property, and the estimated commercial loss. Persons owning residential property in the Buyout Zone (otherwise known as Zone 1) will be compensated at a rate of $19.25 per square foot of living area, plus $3,375 per occupant for each occupant residing at the property as of August 29, 2005.[16] Non-owner occupants living in the Buyout Zone as of August 29, 2005 will receive $3,375 per person, and commercial property owners are also entitled to monetary compensation.

In Zone 2, owners of residential property will be compensated at a rate of $14.39 per square foot of living area, plus $3,375 per occupant. Non-owner occupants will receive $3,375 per person. In Zone 3, residential property owners will receive $10 per square foot of living area plus $2,500 per occupant. Non-owner occupants are awarded $2,500 per person. Commercial property owners in both Zones 2 and 3 are also entitled to compensation. Finally, residential and commercial property owners in Zone 4 will receive flat payments of $15,000 per property, and any tenants within this Zone who paid rent as of August 29, 2005 will receive $2,500 per person. Multiple owners with interests in a commercial property will share the $15,000 payment.

Taking into consideration the legal and factual obstacles recited in the previous section, the Court finds that the monetary compensation afforded to class members falls within the reasonable range of recovery. The class members' awards could have been significantly reduced if the case had proceeded to trial and the fault of the Corps was introduced. The compensation is also reasonable based on the fact that the Plaintiff class members' properties were heavily damaged by flood waters before oil contaminated the properties. The program uses the appropriate factors to determine the amount of harm that individual members suffered—the amount of oil contamination found in the area; the square-footage of the residence or commercial building; and the number of people residing at the property. All are relevant measures when considering just relief for property damage due to an oil spill.

Furthermore, class members benefit from Murphy's agreement to remediate the class-wide area. All properties in all Zones will be remediated to the satisfaction of governmental regulators and this Court, and homeowners will be able to return to the properties once testing confirms that property is safe for occupancy. The Settlement Agreement thus does not provide a limit on the amount of money to be spent on remediation efforts, though the current estimate for future remediation costs stands at $20 million and past remediation cost totals almost $52 million. This feature of the Settlement Agreement's remediation provision is important because it ensures the health and safety of the community and places it at the highest level of priority. Remediation will limit future damage to the community by preventing the travel of oil to other areas and ensuring that residents are not subjected to the harmful effects of further oil exposure. Furthermore, remediation will help to revitalize the community and increase property values.

All class members, and the St. Bernard community in general, will benefit from the settlement of this class action. The Settlement Agreement squarely falls within the reasonable range of relief for property damage and fully addresses the Plaintiff class members' claims. The quality

---

**16.** Those in the Buyout Zone who already settled with Murphy will receive an amount in accordance with the above formula minus amounts Murphy already paid to them.

and comprehensiveness of the benefits provided attests to the fairness, reasonableness and adequacy of the Settlement Agreement. In approving a factually similar class action settlement arising out of underground oil seepage that caused damage to property, the United States Court of Appeals for the Eighth Circuit further explained why the use of compensation zones was appropriate:

It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance various from person to person (i.e., a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

. . . . .

. . . Each property owner stands to gain from Amoco's agreement to compensate landowners for damage already sustained to property, and from Amoco's undertaking steps to revitalize the community and to increase property values.

*Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1146–48 (8th Cir.1999). These observations apply with equal, if not greater, force in this case.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

 Counsel are the Court's "main source of information about the settlement," *Manual for Complex Litigation* § 21.641, and therefore the Court will give weight to class counsel's opinion regarding the fairness of settlement. *See Cotton,* 559 F.2d at 1330 ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties."). Class counsel's opinion should be presumed reasonable because they are in the best position to eval-

uate fairness due to an intimate familiarity with the lawsuit. *Boyd v. Bechtel Corp.,* 485 F.Supp. 610, 622 (N.D.Cal.1979). However, the Court's deference must not be so great that it blindly follows class counsel's recommendations. *Id.* Rather, the Court must give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement. *Id.* (citing *Pettway,* 576 F.2d at 1215–16, and *Saylor v. Lindsley,* 456 F.2d 896, 900–01 (2d Cir.1972)).

More than twenty members of the PSC, all able and experienced attorneys, have submitted affidavits stating that they believe the settlement constitutes a good bargain achieved on an arms-length basis. As stated above, the PSC obtained a thorough understanding of this litigation's strengths and weaknesses through extensive motion practice, discovery, and past experience with similar cases. The Court therefore affords deference to their views.

Additionally, all of the class representatives in this matter—Phyllis N. Michon, Cherie Scott Perez, James Shoemaker, Fernand Marsolan, and Robin Diaz Clark—submitted affidavits in which they state that it is their opinion that the proposed settlement is fair, reasonable, and adequate and that they have no objections.

The attitude of absent class members, expressed either directly or indirectly by their failure to object after notice or high level of participation in the proposed settlement program, is an additional factor on which district courts generally place heavy emphasis. *See In re Microstrategy, Inc. Sec. Litig.,* 150 F.Supp.2d 896 (E.D.Va. 2001) (stating that class reaction is perhaps the most significant factor in determining whether a settlement is adequate). In the present case, of 3,800 potential claimant properties, there are only two objectors, and as of December 19, 2006, only 251 potential claimants have opted out of the class settlement program. (Perullo

Aff. Ex. F. ¶ 11.) Thus, approximately 93% of potential class members have accepted the settlement. Additionally, as of December 19, 2006, 4,065 proof-of-claim forms have been received, with 3,997 of these being approved as accurate and 88 being corrected (Perullo Aff. Ex. F. ¶ 8.) These numbers indicate a pronounced response in support of the proposed settlement.

In summary, a thorough analysis of the *Reed* factors supports a finding that the settlement should be approved.

### C. Objections

■ Any class member who does not opt out may object to the settlement under Rule 23(e)(4). The absence or small number of objections may provide a helpful indication that the settlement is fair, reasonable, and adequate. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d at 217–18; *Pettway*, 576 F.2d at 1216–17 (stating that the higher the number of objectors, the heavier the burden of proving fairness, and ruling that it was an abuse of discretion to approve a settlement opposed by the named plaintiff and 70% of class members). *But see In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D.Del.2002) (stating that though class reaction is an indicator of class member support, courts must not place too much dependence on a small number of objections); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt–Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L.Rev. 1529, 1532–34 (2004) (cautioning that reliance on low opt-out and objection numbers in any given case may be misplaced given

that the authors found opt-out and objection rates to be "trivially small in the mass of cases"). However, a court may approve a class action settlement even if opposition exists. *See Ayers v. Thompson*, 358 F.3d 356, 368–73 (5th Cir.2004) ("That several class members desire broader relief ... does not prevent judicial approval of this settlement agreement, which promises substantial relief to the class."). Nevertheless, courts must independently examine all objections to determine if they have merit and whether they raise questions regarding the fairness of settlement. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d at 217–18. Courts have held that objections must be sufficiently clear and unambiguous for court consideration, or otherwise the party will be deemed to have waived their objection. *Luevano v. Campbell*, 93 F.R.D. 68, 77 (D.D.C.1981). Moreover, objectors must comply with procedural requirements stipulated in the settlement agreement, such as filing a written statement of objection with the court in advance of the hearing and giving notice of intent to appear at the fairness hearing. However, the court has discretion to permit objections at the fairness hearing even if the party wishing to voice an objection has not filed a written statement in advance. *See e.g., In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, MDL 991, 1994 WL 599525, at *4–5 (E.D.La. Nov.1, 1994); *In re Prudential–Bache Energy Income P'ships Sec. Litig.*, 815 F.Supp. 177, 179 (E.D.La.1993).

The Court received 29 purported objection letters, but only 21 were filed by class members.[17] At the fairness hearing, the Special Master submitted to the Court a

---

**17.** Edwin and Melissa Lacoste, Antoinette L. Pellittieri, Daniel L. and Nathalie P. Frederick, Kim Lapara, Donna LaBouef, Tommy and Kerilyn Imbraguglio, and Ryan Casey are all parties who participated in Murphy's voluntary settlement program, and thus do not have standing to object to the class settlement. In any event, their letters do not address the fairness of the proposed settlement's terms and conditions. Additionally, Mr. Howell Robertson, III, filed an objection letter. However, this property is not included

report which stated that class members wished to withdraw 19 of these objections (Rec.Doc. 1043).[18] The Special Master met with all of these objectors to discuss their individual issues, and he recommended that the Court allow these objectors to withdraw their written statements. Pursuant to Rule 23, objections to proposed settlements may only be withdrawn with court approval. *See* Fed.R.Civ.P. 23(e)(4)(B). After a review of these objection letters and the Special Master's recommendations, the Court permits the withdrawal of these objections.

Besides the two objectors who addressed the court at the fairness hearing, discussed in more detail below, and those parties permitted to withdraw their objections, as discussed above, the Court also received a letter from Elizabeth and Michael Kreck. Their letter does not state any objection to the settlement program, but only states a belief that oil contaminated their property. Moreover, they did not appear to make a statement at the fairness hearing, nor did they send their letter to the PSC or Murphy, as required by the Settlement Agreement. (Settlement Agreement 19.) Accordingly, the letter, assuming it is an objection, is deficient and therefore is dismissed.

Two objectors remain and both were given an opportunity to be heard at the fairness hearing. The first objector is Mr. Gregory Faia, an attorney who specializes in real estate law. His objection deals with his individual interest in settlement proceeds, which he alleges was improperly given to a third party. Specifically, Murphy settled a claim during its voluntary settlement program with the record owner of the damaged property, Ms. Georgia Valenza, who was Mr. Faia's secretary. Ms. Valenza received a settlement check and confirmed on video that she was the owner of the property. The Claims Administrator's review of the available public records confirmed that Ms. Valenza was indeed the record owner. Mr. Faia claims that he purchased the property from Ms. Valenza on April 13, 2003, but the Sale and Assumption of Mortgage was not recorded until January 13, 2006, more than three years after the sale and also after Ms. Valenza settled with Murphy and received settlement proceeds. Ms. Valenza has now moved out of the state and will not turn over the settlement proceeds to Mr. Faia. Mr. Faia thus seeks his own award under the settlement program for the property at issue. Murphy responds that it has already paid for the damage and relies on the Public Records Doctrine as evidence that it paid the record owner of the property and thus acted appropriately.

Mr. Faia's objection does not concern the fairness, adequacy, or reasonableness of the settlement, but rather concerns the claims administration process and whether he should receive a settlement award. The Court retains jurisdiction over the administration of all claims and, accordingly, it will take this matter independently under submission as it is not related to the Court's determination regarding approval of the settlement program.

The second objector to the proposed settlement is Mr. Wayne Duchmann.[19] Mr.

within the certified class area and he therefore has no standing to object.

**18.** These class members include: Arthur and Sondra Arsenaux; Terrence and Nicholas Meyers; Michael C., Alice J., and Julie A. Ginart; Jules R. Dixon and Jacob J. Borrouso, Jr.; Bernie and Linda Deschamp; Raymond and Darlene Albert; Peter and Betsy Harrison; Glenn, Cindy, and Gregory Gabb; Blaise and Sandra Sauro; Daniel Paul, Yves Joseph, Kerry W., and Colleen Morgan Bourgeois; William and Sheri Follette; James F. Phillpott; Ronald J. and Rosemary Caruso; Kevin Karcher; Cathy O'Brien Bowers; John and Joyce Thonn; and Cheryl Migliore.

**19.** Mr. Duchmann's objection includes a letter, as well as a video clip of an appearance he made as a "concerned citizen" on "It's No

Duchmann explained that he is a long-time resident of St. Bernard Parish and an environmental activist. He feels the need to speak for all of those who have died defending our country and its values. Mr. Duchmann claims that the proposed settlement is not fair because he believes Murphy should purchase property in the Buyout Zone at pre-Katrina values.[20] He also raises a concern regarding the impact of the spill on the health and safety of residents.

An issue has been raised regarding Mr. Duchmann's standing to object to the settlement program. The settlement notice specifically states that objectors must provide proof of residency and/or property ownership in the class area as of August 29, 2005. (Legal Notice of Class–Wide Settlement 9–11.) Mr. Duchmann did not provide these materials with his written objection. However, Mr. Duchmann states that he speaks for his mother, who is recently deceased, and that she allegedly owned property within the Buyout Zone. At the fairness hearing and in a memorandum, proponent counsel stated that Mr. Duchmann did not have power of attorney with respect to his mother's affairs and noted that he has presented no evidence that he is the appropriate succession representative of his mother's estate. Thus, according to proponent counsel, Mr. Duchmann lacks standing to object to the settlement under Louisiana law because he is not a class member nor does he legally represent a class member.

According to article 935 of the Louisiana Civil Code, "[p]rior to the qualification of a succession representative only a universal successor may represent the decedent with respect to the heritable rights and obligations of the decedent." Additionally, "[e]xcept as otherwise provided by law, the succession representative appointed by a court of this state is the proper plaintiff to sue to enforce a right of the deceased or of his succession...." La.Code Civ. Proc. Ann. art 685. "Article 685 has been declared to be the controlling provision of law as to whether a succession representative or an heir/legatee is able to enforce rights of the succession." *Boyer v. Stric-Lan Co. Corp.*, 04–872, (La.App. 3 Cir. 11/10/04); 888 So.2d 1037, 1042 (citing *Baten v. Taylor*, 386 So.2d 333 (La.1979) and *Horrell v. Horrell*, 99–1093 (La.App. 1 Cir. 10/6/00); 808 So.2d 363).

At the fairness hearing, Mr. Duchmann presented no proof of his qualification as his mother's successor. Upon questioning by the Court, Mr. Duchmann stated that his brother is his mother's successor, though Mr. Duchmann stated that he appeared at the hearing on behalf of his brother and the rest of his family. The law of Louisiana is clear and unambiguous that a successor is the proper legal representative of a deceased party and only the successor may enforce the deceased's rights. Accordingly, Mr. Duchmann lacks standing to file an objection as he is not a class member and does not legally represent a class member.

Nevertheless, for the sake of comprehensiveness and resolution of the matter, the Court will address Mr. Duchmann's argument. As noted, Mr. Duchmann argues that Murphy should purchase proper-

---

Problem" with Ernie Cosse. These documents were submitted into evidence and reviewed by the Court as part of its examination of his objection.

20. Mr. Duchmann previously mailed a letter to the Court on November 29, 2006, requesting termination of all PSC attorneys. The Court noted that it would not revisit the issue at that time as the Court had determined that counsel would fairly and adequately represent the class under Rule 23(g) of the *Federal Rules of Civil Procedure*. However, the Court informed Mr. Duchmann of his right to object to the settlement program and opt out of the class.

ties within the Buyout Zone at pre-Katrina values. The Court has found, however, that $40 per square foot of living area is reasonable compensation as it represents the upper-end of current market value. Regarding Mr. Duchmann's concern for the health and safety of the St. Bernard community, the Court has expressed its approval of the remediation plan which will be overseen by governmental regulators and the Court and requires properties to be fully remediated before being reoccupied. Furthermore, the buffer zone created through the buyout program will remove the most heavily contaminated properties from residential use. Accordingly, Mr. Duchmann's objection is overruled.[21]

### D. Approval of the Settlement

█ Accordingly, for the foregoing reasons, the Court determines that the settlement program is fair, reasonable, and adequate and is in the best interests of all class members.

## III. ATTORNEYS' FEES AND EXPENSES

### A. Introduction

As contemplated by the Settlement Agreement, the PSC has filed a Motion for Common Benefit Fees and Expenses Pursuant to Rule 23(h) of the *Federal Rules of Civil Procedure.* In this motion, the PSC seeks reimbursement from Murphy for (1) the reasonable fees for services performed for the benefit of the class and (2) the reasonable costs and expenses incurred for

the benefit of the class. As noted above, the parties "have made no agreement regarding what the award of counsel fees and expenses should be." (Settlement Agreement 25.) However, the parties have agreed that "the amount of any award by the Court of any common benefit of attorneys' fees and expenses shall be paid by Murphy over and above the benefits provided to the Class." (Settlement Agreement 25.)

### B. Attorneys' Fees

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (citation omitted). However, the United States Supreme Court has long recognized that "the historic power of equity" permits "a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (discussing *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882), and subsequent cases).

█ A treatise on class actions explains the application of this doctrine in modern complex litigation:

> the overall fairness of the proposed settlement. "An opportunity to opt out after the settlement terms are known ... might reduce the need to provide procedural support to objectors or to rely on objectors to reveal deficiencies in a proposed settlement. Class members who find the settlement unattractive can protect their own interests by opting out of the class." *Manual for Complex Litigation* § 21.643.

---

21. The Court notes that objectors have been afforded the opportunity to opt out of this class action settlement. Assuming Mr. Duchmann has standing to object, if he is unhappy with the compensation afforded under the settlement program, he may opt out and pursue individual litigation against Murphy. Thus, Mr. Duchmann is afforded a remedy to address his individual needs and his objection will not affect the Court's determination as to

When a plaintiff in an individual or representative capacity creates, increases, or preserves a fund by settlement or judgment, which benefits an ascertainable class, the court in exercising its equity jurisdiction, may grant class counsel fees by directing payment from the fund. It is an equitable doctrine based on the rationale that successful litigants would be unjustly enriched if their attorneys were not compensated from the fund created for the litigants. 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 13:76 (4th ed.2002); *see also* 1 Paul D. Rheingold, *Litigating Mass Tort Cases* §§ 7:25–7:62 (2006). It has also been suggested that in addition to this restitutionary justification, "attorneys who run class actions are entitled to be paid because fee awards encourage them to protect class members' rights." Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 Cornell L.Rev. 656, 658 (1991); *see In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1296, 1303 (E.D.N.Y.1985) ("Given the extensive financing and large numbers of skilled lawyers needed to bring a complex class action and prosecute it to a successful conclusion, and the large risk of no-recovery-or of a limited one-even when a case appears to have merit, substantial legal fees must be provided when a substantial fund is created if attorneys are to be induced to prosecute these actions."). Rule 23 of the *Federal Rules of Civil Procedure* was amended in 2003 to formally recognize the equitable power of the court to set common benefit fees in the class action setting: "In an action certified as a class action, the court may award reasonable attorneys' fees and nontaxable costs authorized by law or by agreement of the parties." Fed.R.Civ.P. 23(h).

While the negotiation of a specific fee award in a class action settlement by no means precludes judicial approval of the settlement, *see Ayers v. Thompson*, 358 F.3d 356, 374–75 (5th Cir.2004), counsel in this case must be commended for focusing on the class's recovery and leaving the issue of fees entirely to this Court's discretion. Indeed, the settlement agreement in this case "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir.1998); *see also* Part II.B.1, *supra*.[22] The drafters of Rule 23(h) recognized that "[a]ctive judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process." Fed.R.Civ.P. 23 advisory committee's note. In an age of increasing skepticism regarding the proper role of class actions in our legal regime, the Court cannot help but think that the class action device has been admirably and efficiently utilized as intended in this case, in large part thanks to the professionalism of all counsel involved.

Moreover, because it has agreed to pay attorneys' fees over and above the class recovery, Murphy has a real interest in the Court's scrutiny of the attorneys' fees issue. Consequently, the Court has the benefit of "adversarial testing" of the PSC's fee request, unlike in traditional common fund cases, where the defendant remains silent because the fee comes from class members' pockets. *See Third Circuit Task Force Report on Selection of Class Counsel*, 74 Temp. L.Rev. 689, 705–08 (2001); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir.1992) ("Since the defendants were out of the case by virtue of their settlement—it being agreed

---

**22.** Of course, even if the parties would have negotiated a fee, "[a] district court is not bound by the agreement of the parties as to

the amount of attorneys' fees." *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir.1980).

that the lawyers' fees were to come out of the settlement amount—they had no incentive to oppose the request for fees, and they did not.... This put more work on the district judge and more work on us than in a case where there is an adversary to keep the plaintiff and appellant honest."); [23] *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 37–38 (D.N.H.2006) ("With no adversary to challenge the Plaintiffs' proposal, the Court has been left to fend for itself in crafting an approach for assessing reasonableness.").

In this case, the Court has the full benefit of detailed argument on the attorneys' fee issue. The parties have vigorously advocated for and against the amount of the award and the methodology to be employed in calculating the award. Both the PSC and Murphy have submitted extensive briefs describing what they believe the appropriate amount of attorneys' fees and costs to be. The Court will summarize the parties' arguments before proceeding to its analysis.

The PSC asks the Court to award over one-hundred million dollars in attorneys' fees, $115,544,100 to be exact, which represents 35% of a purported settlement value of $330,126,000. The PSC arrives at this amount based on three primary assertions. First, the PSC contends that the total stated value of the settlement should be used to calculate fees due to the PSC's involvement since this litigation's inception. In support of this contention, the PSC states that Murphy's voluntary settlement program did not begin until *after* the first class action was filed, *after* the PSC

members began investigative efforts and experts were hired, and *after* the Court formally appointed the PSC members as "interim" class counsel. Second, the PSC argues that an initial "benchmark" percentage of 28% is appropriate in this case given that other plaintiff's counsel, besides PSC members, will share in the fee upon demonstrating contributions to the common benefit. Additionally, the PSC states that this case is not representative of a typical class action when viewed in the context of the demands that Hurricane Katrina placed on the lives and working conditions of PSC attorneys, many of whose law firms were located in areas impacted by the storm. Lastly, after a review of the *Johnson* factors, the PSC argues that the 28% benchmark should be increased to 35%.

Conversely, Murphy argues that there is no legal or factual justification for an award of approximately $115 million. Instead, it contends that an award of approximately $13.6 million for attorneys' fees is appropriate in this case. Murphy first takes issue with the pot from which attorneys' fees are calculated being valued at $330,126,000. Murphy argues that the pot should be valued at $195 million. It contends that the amounts attributable to its voluntary settlement program and pre-class settlement remediation should not be included in the total figure from which attorneys' fees are calculated because the PSC contributed little or nothing to these activities. To arrive at the $13.6 million figure, which represents 7% of $195 million, Murphy uses the percentage method

23. The Court in *In re Continental Illinois Securities Litigation* went on to say:

The lawyers are not to blame. They are entitled to seek fees, and entitled to appeal if the district judge cuts them down. But judges in our system are geared to adversary proceedings. If we are asked to do nonadversary things, we need different procedures. When lawyers request fees from a class settlement fund, they are not like adversaries in litigation; they are like artists requesting a grant from the National Endowment for the Arts. Grant-making organizations establish nonadversarial methods for screening applications; perhaps we need something like that for cases like this. 962 F.2d at 573.

complimented by a "lodestar" cross-check analysis. Murphy does not take issue, however, with the costs and expenses figure submitted by the PSC.

### 1. Methodology for Calculation of Attorneys' Fees

 Courts in this Circuit have traditionally calculated reasonable attorneys' fees by using the "lodestar" method, which begins with the calculation of the reasonable number of hours expended on litigation multiplied by a reasonable hourly rate. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 583 n. 15 (5th Cir.1980). This figure is then adjusted upward or downward based on an analysis of twelve factors known as the *Johnson* factors. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5)

the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.; see also Von Clark v. Butler*, 916 F.2d 255, 258 n. 3 (5th Cir. 1990).[24]

However, there is a growing trend in the courts throughout the country to utilize a different approach in common fund cases, awarding attorneys' fees as a percentage of the common fund. The popularity of this method gained momentum following the publication of an influential Third Circuit Task Force report in 1985, which discussed the theoretical and practical problems associated with application of the lodestar method in common fund cases. *See Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985).[25] Recognizing the "con-

---

**24.** Although the parties agree that the *Johnson* framework should be utilized in this case, the Court has nevertheless considered a threshold choice-of-law issue, namely whether federal or state law governs the Court's attorneys' fees analysis.

Until recently, the Fifth Circuit had yet to decide whether, in diversity cases, "state or federal law controls the calculation of [attorneys'] *fees as distinguished from their entitlement." Robinson v. State Farm Fire & Cas. Co.*, 13 F.3d 160, 164 (5th Cir.1994) (citing *Powell v. Old S. Life Ins. Co.*, 780 F.2d 1265, 1267–68 (5th Cir.1986)). Because Texas courts utilize a methodology similar to *Johnson*, the Fifth Circuit had refused to resolve the issue in diversity cases applying Texas law. *See Mid–Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 232 (5th Cir. 2000). But, in *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir.2002), the court explicitly held that "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *See also Mangold v. Cal. Pub. Util-*

*ities Comm'n, 67 F.3d 1470, 1479 (9th Cir. 1995) (reaching the same conclusion).

Despite these developments, the Court will utilize the *Johnson* framework in this case. First, although the claims certified for class-wide treatment arise solely under Louisiana state law, the settlement of these claims ensures that state law has supplied no rule of decision. Second, like the Texas courts, the Louisiana courts also employ a multi-factor methodology that is similar to the *Johnson* approach. *See* Frank L. Marist, *Civil Procedure—Special Proceedings* § 10.2, in 1A *Louisiana Civil Law Treatise* (2005); *see also Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 689–90 (5th Cir.1991); *Robichaux v. Glorioso*, No. 00–1426, 2000 WL 1171119, at *3 n. 2 (E.D.La. Aug.16, 2000).

**25.** The deficiencies in the lodestar method mentioned by the Third Circuit Task Force include:

(1) increased workload on an already overtaxed judicial system, (2) inconsistent appli-

tingent risk of nonpayment" in such cases, courts have found that class counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.*, 968 F.Supp. 1116, 1132 (W.D.La.1997) (summarizing the various methods used to calculate attorneys' fees); *see In re Cabletron*, 2006 WL 2947566, at *7 (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (internal citation omitted); Samuel R. Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U. Pa. L.Rev. 281 (1977). Moreover, courts find that the percentage method provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys. *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross–Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1456–57 (2005) (citing *In re Activision Sec. Litig.*, 723 F.Supp. 1373, 1378 (N.D.Cal.1989)).

While the United States Supreme Court has approved of the percentage method in common fund cases, *see Blum v. Stenson*, 465 U.S. 886, 900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), *Cent. R.R. & Banking v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), *and Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 773–75

(11th Cir.1991) (reading *Blum* as the Supreme Court's "acknowledgment" of the percentage method), it has never formally adopted the lodestar method in any type of case. *See generally In re Prudential–Bache Energy Income P'ship Sec. Litig.*, MDL 888, 1994 WL 150742 (E.D.La. Apr.13, 1994) (tracing the history of the various methods). Likewise, though the Fifth Circuit has not explicitly accepted the percentage method, it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable. *See Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 851–52 & n. 5 (5th Cir.1998); *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir.1996); *La. Power & Light v. Kellstrom*, 50 F.3d 319, 331 (5th Cir.1995); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161 (5th Cir. Unit A Sept.1981). Accordingly, staying within the *Johnson* framework, numerous district courts in this Circuit have primarily applied a "blended" percentage method to determine a reasonable fee award. *See, e.g., In re Bayou Sorrel Class Action*, No. 04–1101, 2006 WL 3230771 (W.D.La. Oct.31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.*, 447 F.Supp.2d 612, 628–29 (E.D.La.2006); *Batchelder v. Kerr–McGee Corp.*, 246 F.Supp.2d 525, 529 (N.D.Miss.2003); *In re Combustion, Inc.*, 968 F.Supp. at 1135–41; *In re Catfish Antitrust Litig.*, 939 F.Supp. 493 (N.D.Miss.1996).

Keeping in line with Fifth Circuit precedent, the Court finds that the blended

cation of the approach and widely varied fee awards, (3) illusory mathematical precision unwarranted by the realities of the practice of law, (4) potential for manipulation, (5) reward for wasteful and excessive attorney effort, (6) disincentive for early settlement, (7) insufficient flexibility for judicial control of litigation, (8) discouragement of public interest litigation, and (9)

confusion and lack of predictability in setting fee awards.
*See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross–Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 Geo. J. Legal Ethics 1453, 1456 (2005) (summarizing the *Third Circuit Task Force Report*) (internal quotations omitted).

percentage approach is an appropriate method for calculating reasonable attorneys' fees in this case. Accordingly, the Court will first determine the valuation of the benefit received by the class and then select an initial benchmark percentage. The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case. Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a rough cross check on the reasonableness of the fee arrived at by the percentage method.

## 2. Valuation of the Benefit Obtained

■■■ According to the terms of the settlement agreement, the total value of the settlement is currently estimated at approximately $330,126,000. This total value is broken down as follows: $55,000,000 paid by Murphy to purchase properties from class members; $120,000,000 paid by Murphy to compensate class members directly; $83,264,000 paid by Murphy in its voluntary settlement program; $51,862,000 paid by Murphy in remediation costs prior to the class settlement; and an estimated $20,000,000 to be paid by Murphy in remediation costs after the class settlement.

For purposes of calculating reasonable attorneys' fees in this case, however, the Court finds that the appropriate amount from which attorneys' fees will be calculated is $195,000,000. This sum includes the $120,000,000 to compensate class members directly, $55,000,000 to purchase properties; and the estimated $20,000,000 in future remediation costs.

First, as mentioned above, the parties dispute whether the $83,264,000 paid in voluntary settlements, or any part of it,

should be included within the pot from which attorneys' fees are calculated. Murphy argues that these voluntary settlement agreements were made before entering into the Settlement Agreement with the PSC and are not the product of PSC efforts. Murphy further argues that the PSC actually sought to prevent any voluntary settlements between Murphy and persons within the class area and on several occasions even tried to terminate the voluntary settlement program. Conversely, the PSC argues that its efforts had a real and direct effect on the establishment and/or perpetuation of the voluntary settlement program because Murphy did not establish the program until after the first class action lawsuit was filed, after the PSC members began investigative efforts, and after the Court appointed interim PSC counsel.

The Court has previously acknowledged the possibility that the PSC may have had a direct effect on perpetuating Murphy's voluntary settlement program and ordered that a percentage of the gross recovery of any such settlements be set aside as potential common benefit fees and costs. *See Turner v. Murphy Oil USA, Inc.*, 422 F.Supp.2d 676 (E.D.La.2006). After a detailed analysis, the Court imposed set-asides in the amount of 12% of a settling party's total recovery, with 10% of the recovery to be set-aside as fees and 2% to be set-aside as costs. *Id.* at 683–84. However, in its set-aside Order, the Court made no finding as to whether the PSC's efforts *actually* amounted to a contribution of 12%. Rather, the Court's primary reason at that time for imposing the set-aside was to ensure that adequate funds would be available if the class members were successful in their case. The Court provided that "[i]f the funds to be set aside are excessive, any surplus will be returned to the attorneys and their clients. Ultimately, the PSC and other attorneys will

need to demonstrate the existence of a common benefit to receive payment; however, that date has not yet arrived." *Id.* at 681.

In a separate order dated April 7, 2006, the Court determined that the PSC had contributed in a real and tangible way to the benefit of certain parties who participated in Murphy's voluntary settlement program (Rec.Doc. 284).[26] The Court found that Murphy's expansion of its voluntary settlement zone was directly linked to the efforts of the PSC in obtaining class certification:

> Murphy's expansion of its Settlement Program is clearly due to the common-benefit work of Plaintiffs' counsel. Murphy was aware of the EPA oil-plume perimeter prior to class certification, but Murphy rigidly stood by its own settlement area. Murphy refused to expand its settlement area to the EPA perimeter until this case was certified as a class action.

*Id.* It is clear upon a review of the entire record that the PSC did contribute to the voluntary settlement program. Moreover, the Court has already quantified the amount of work the PSC contributed to the voluntary settlements when it established the set asides. The Court finds that the PSC is entitled to the full amount represented by these set asides.[27]

However, as the Settlement Agreement calls for Murphy to pay all common benefit fees and expenses, the set-aside amounts currently being held in escrow shall be returned to the parties from whom they were taken and, accordingly, set asides will not be deducted from any future settlements or judgments. Consequently, an amount of money equal to the escrow ac-count's value, $596,241.88, will be paid to the PSC directly by Murphy, and the Court will not include the $83,264,000 figure in the pot from which attorneys' fees are calculated.

Second, the Court will exclude the $51,862,000 in pre-class settlement remediation costs, which Murphy spent pursuant to its obligations to federal and state environmental regulators. These expenses are related to Murphy's cleaning of public spaces and properties of homeowners who gave Murphy permission to test and/or remediate their property.

Consequently, the Court determines that $195,000,000 is the appropriate pot from which to calculate attorneys' fees.

### 3. Benchmark Percentage

■ The Court will now determine an initial benchmark percentage. As stated in the set-aside order, "the percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved. In short, there is no one percentage that should apply to all cases. Each case should be analyzed on its own basis." *See Turner v. Murphy Oil USA, Inc.,* 422 F.Supp.2d 676, 682–83 (E.D.La.2006). A number of courts throughout the country have utilized data compiled in a recent empirical study of attorneys' fees in class action settlements, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27, 31–32 (2004), when computing the appropriate benchmark percentage. *See In re ETS,* 447 F.Supp.2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185

---

**26.** The Court modified its set-aside order, providing that 7% would be withheld from settlements made with claimants who reside within the class boundary, but not within Murphy's self-defined settlement area, who have opted out of the class action, and who have not retained counsel.

**27.** This includes the 2% attributable to costs and expenses incurred.

(S.D.Fla.2006); *In re Cabletron*, 2006 WL 2947566, at *11.[28] The Eisenberg and Miller study sheds light on at least two of the *Johnson* factors: the customary fee and awards in similar cases. *Johnson*, 488 F.2d at 718–19. The authors conclude that

> because our study finds an overwhelming correlation between class recovery and attorney fees; the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of the class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further.

Eisenberg & Miller, *supra*, at 72.[29] The authors compiled two databases of class settlements:

> First, we compiled data on all state and federal class actions with reported fee decisions between 1993 and 2002, inclu-

sive, in which the fee and class recovery could be determined with reasonable confidence. Second, we used information on class actions reported in the March–April 2003 edition of *Class Action Reports* (*CAR*), which contains more than 600 common fund cases from 1993 to 2002.

*Id.* at 28 (discussing Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003)). These two data sets were divided into ten ranges of recovery (deciles). The mean and median fee percent, as well as the standard deviation, for each range of recovery or decile was then computed. *Id.* at 73. According to the authors, a fee request within one standard deviation is "generally reasonable" unless a concern exists regarding approval, whereas a fee request falling within one and two standard deviations from the mean may require further justification, and a request falling more than two standard deviations from the mean is "presumptively unreasonable" and should be treated with a high level of scrutiny. *Id.* at 74.

---

**28.** It should be noted that there have been other empirical studies of attorneys' fees in class actions. *See, e.g., In re Cabletron*, 2006 WL 2947566, at *10 (listing several other comprehensive studies, including, but not limited to, Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003); Denise M. Martin, et al., *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*, 5 Stan. J.L. Bus. & Fin. 121, 141 (1999); Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 72 (1996) (version published at 71 N.Y.U. L.Rev. 74 (1996)); and William J. Lynk, *The Courts and the Plaintiffs' Bar: Awarding the Attorney's Fee in Class–Action Litigation*, 23 J. Legal Stud. 185, 194 (1994)). These studies only begin "to scratch the surface of the vast body of statistical analysis

available regarding attorneys' fee awards in complex class actions." *Id.* at *11.

**29.** It should also be noted that Eisenberg and Miller speak of specific numeric "requests" for attorneys' fees, supporting the view that in the vast majority of class action settlements, class counsel negotiate a specific fee. However, the settlement in this case "is not subject to many of the criticisms leveled against other class action settlements. By providing in the settlement agreement that the Court would set the amount of attorneys' fees, the parties precluded the 'danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.'" *In re Copley Pharm., Inc.*, 1 F.Supp.2d 1407, 1417 (D.Wyo.1998) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)).

Given that the parties have not negotiated a specific fee award, the Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude.[30] The Court has already determined that for purposes of calculating reasonable attorneys' fees in this case, the class benefit is valued at $195,000,000. This recovery falls within the "greater than 90%" decile of client recovery in the Eisenberg and Miller study, which includes all recoveries greater than $190 million. In the "reported fee decisions" data set, the mean fee percent for cases in this decile is 12%, with a standard deviation of 8.1%. *See* Eisenberg & Miller, *supra*, at 73. In the *"CAR* data set", the mean fee percent for non-securities cases in this decile is 17.6%, with a standard deviation of 10.6%. *Id.*[31]

While the *Manual for Complex Litigation* states that a fee of 25% of a common fund "represents a typical benchmark," *see Manual for Complex Litigation* § 14.121, Eisenberg and Miller report that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Eisenberg & Miller, *supra*, at 28. In other words, the higher the recovery, the lower the percentage. Thus, after considering fee awards in similar cases, the Court will use an initial benchmark of 15% in this case, which is "roughly the average of the mean fee percentages of the two [Eisenberg and Miller] data sets for settlements of this size." *In re ETS*, 447 F.Supp.2d at 630.

### 4. Consideration of the Johnson Factors

■ The Court will now consider the various *Johnson* factors, coupling them together where the circumstances of this case suggest a combined analysis, to determine whether an adjustment to the initial benchmark of 15% is warranted.[32] For the following reasons, the Court finds that the *Johnson* factors support adjusting the percentage upward to 17% in this case.

---

**30.** This procedure is similar to the "market mimicking approach" employed by courts within the Seventh Circuit and recently adopted by a federal district court in New Hampshire. *See In re Cabletron*, 2006 WL 2947566, at *10. The market mimicking approach attempts to assess what the fee arrangement would have been had it been determined by an open competitive market at the beginning of a case. *Id.* A court can determine a market rate fee arrangement by combining two primary sources of information—research data analyzing other class action, non-fee-shifting cases (i) where fees are awarded at the end of the case and (ii) where fees are awarded at a case's outset through a competitive bidding process. *Id.* As part of its "mimic the market" analysis, the court in *In re Cabletron* placed considerable weight on the Eisenberg and Miller study. *Id.* at *11.

**31.** Thus, according to Eisenberg and Miller, if the "reported data set" is used, a fee request that falls somewhere in the range of 3.9% to 20.1% should be considered presumptively reasonable. A fee request lower than 3.9% or between 20.1% and 28.2% may require further justification, and a fee request higher than 28.2% (i.e., more than two standard deviations above the mean percent) should be highly scrutinized. Likewise, if the *"CAR* data set" for non-securities cases is used, a fee between 7% and 28.2% is presumptively reasonable; a fee request lower than 7% and between 28.2% and 38.8% requires further justification, and a fee request above 38.8% demands a high level of judicial scrutiny.

**32.** The Court has attempted to heed the advice of the Fifth Circuit in this respect: "[W]e will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *La. Power & Light v. Kellstrom*, 50 F.3d 319, 331 (5th Cir.1995); *see also Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir.1996) (quoting *Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir.1987)).

**(a) The Time and Labor Required; Time Limitations Imposed by the Client or the Circumstances; The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case**

Class counsel and their staff have logged over 34,000 hours of work during the course of this litigation, which lasted approximately eighteen months. In this time, the Court has repeatedly expressed its intent and desire to see this litigation through to an expedited resolution. Indeed, all interested parties, including the PSC and Murphy, have recognized that prompt resolution would be invaluable to the affected community.

Despite the immediate displacement caused by the storm, and all of the lingering effects that continue to plague everyone in this region, counsel have transformed the Court's desire for prompt resolution into reality. Following the formal appointment of the PSC as class counsel, the attorneys committed to an intensive discovery effort. Numerous witness subpoenas were issued, and over eighty-seven depositions were taken (with multiple tracking of the testimony at times). Thousands of pages of documents and hundreds of exhibits were obtained and then meticulously organized. Over fifty legal motions were filed, supported, opposed, and/or argued before the Court. Trial preparation continued along side of settlement negotiations in the weeks before settlement was confected.

Moreover, the expedited pace and priority of this litigation has undoubtedly precluded counsel from other employment in recent months. Even taking into consideration that a benchmark of 15% is adequate for a case that took only a little over a year to resolve, the Court finds that the above factors justify an upward adjustment of the benchmark percentage.

**(b) The Novelty and Difficulty of the Questions; The Skill Requisite to Perform the Legal Service; The "Undesirability" of the Case**

Although this litigation required complex and technical knowledge, including scientific evidence concerning oil contamination and physics related to the oil tank's movement, floatation, and leakage, the legal claims involved were not so complex or difficult to warrant an upward adjustment to the benchmark percentage. The Court notes that the class members' claims were essentially property damage claims. There was no dispute as to whether harm occurred-as often occurs in personal injury or products liability cases where the effects or harm may not be evident for years. Concrete proof of the damage existed as evidenced by the presence of oil on class members' properties. Additionally, though there was a dispute as to whom the oil spill could ultimately be attributed (which did add some complexity to the case), there is no denying the fact that oil spilled from Murphy's property and migrated to adjoining properties. Moreover, because the case concerned damage to property, harm could be tangibly measured using such factors as square footage of property, level of oil contamination, and number of residents. These factual and legal circumstances, evident from the case's very beginning, in large part helped the parties achieve settlement only a year after the accident's occurrence.

Because the harm in this case was physically and visibly evident and the litigation involved a large number of parties with the same claims and type of damage that could be quantified with relative ease, the Court finds that this class action was not "undesirable." This is especially so in light of the lack of employment opportunities available due to the inertia that plagued the legal community following the immedi-

ate aftermath of Hurricane Katrina, with storm-damaged courts and businesses closed and citizens displaced across this State and beyond.

Accordingly, the Court finds that these factors are neutral and do not justify an adjustment to the benchmark percentage. *See Walker v. U.S. Dep't of Hous. & Urban Dev.,* 99 F.3d 761 (5th Cir.1996).

### (c) The Customary Fee; Awards in Similar Cases; Whether the Fee is Fixed or Contingent ·

These factors primarily deal with the expectation of plaintiffs' attorneys at the outset of the case when measuring the risks involved and deciding whether to accept the case. *See Johnson,* 488 F.2d at 718. In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results. Class counsel argues that the customary contingent fee in personal injury suits in this jurisdiction is between 33% and 40%. *See, e.g., In re Shell Oil Refinery,* 155 F.R.D. 552, 571 (E.D.La.1993). However, the settlement compensates class members for crude oil damage to property only, and not for personal injury.

Moreover, the cases the PSC relies upon "do not accurately reflect the actual experience (or the marketplace) in any statistically significant way; rather, they are merely anecdotal examples of cases in which courts have awarded a fee of [33% to 40%] percent," and the Court has already stated its disapproval in employing a method that involves "reflexively awarding" a specified percent. *In re Cabletron,* 2006 WL 2947566, at *7; *see also In re ETS,* 447 F.Supp.2d at 631. In any event, these factors are already taken into consideration by application of the Eisenberg and Miller study. Consequently, no additional adjustment to the benchmark percentage shall be made for these factors.

### (d) The Amount Involved and the Results Obtained; The Experience, Reputation, and Ability of the Attorneys

Class counsel have obtained a favorable settlement on behalf of the plaintiff class:

This is not a case in which the class receives only illusory benefits in the form of coupons or discounts. Rather, counsel has achieved a substantial settlement in an efficient manner that minimizes the drain on the parties' and the Court's resources. Counsel also devised a plan for distribution of the fund and payment of claims that is practical, streamlined, and fair.

*In re ETS,* 447 F.Supp.2d at 632.

As discussed in Part II of this Order & Reasons finding the settlement fair, reasonable, and adequate: the settlement of this case was a welcome alternative to protracted and expensive litigation, the remediation program ensures the health and safety of the community, the buyout program offers class members a price for their properties at the top of current market value, and everyone in the class is compensated. Legal and factual challenges such as allocating the fault to natural forces and/or the Corps could have significantly reduced monetary compensation. PSC members achieved more than a fair and adequate bargain for class members, using impressive legal skill and knowledge based on years of experience with similar-type cases. Thus, the Court finds that these factors support an upward adjustment of the benchmark percentage.

### (e) Nature and Length of the Professional Relationship with the Client

The Court does not find that the nature and length of the professional relationship between class counsel and the class members warrants an increase in the benchmark percentage in this case. "The rela-

tionship did not antedate the litigation, nor will it likely continue beyond the closure of this case," other than as it relates to this litigation. *In re ETS*, 447 F.Supp.2d at 632.

### 5. Adjusted Benchmark Percentage

The Court has found that six of the *Johnson* factors warrant an upward adjustment of the benchmark percentage. Accordingly, the Court will increase the percentage it applies upward to 17% of $195,000,000, or in other words, an amount equal to $33,150,000. As noted, the PSC is also entitled to $596,241.88 for its contribution to the voluntary settlement program. Thus, this analysis suggests that the PSC is entitled to a total of $33,746,241.88 in attorneys' fees.

### 6. Lodestar Cross–Check

■ For confirmation that the determined percentage in this case is appropriate, the Court believes it is important to conduct a lodestar cross-check. Beginning in the mid–1990s, after recognizing that some disadvantages exist to using the percentage method, including a lack of guidance on how to adjust percentage fees in light of the circumstances of a particular case, many courts began to use the lodestar method as a cross-check on the percentage method for reasonableness. *See* Walker & Horwich, *supra*, at 1458–63

(tracing the evolution of the loadstar cross-check and its "rising use"). The Court is mindful that it must not place too much reliance on the Eisenberg and Miller study, even given its comprehensiveness and the advantages it presents in terms of simplicity and consistency.[33] Thus, the application of the *Johnson* factors is helpful to determine whether the benchmark percentage is reasonable given the circumstances of the case (and also necessary according to Fifth Circuit precedent),

In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check:

> The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient.... Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate....

Walker & Horwich, *supra*, at 1463–64 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir.2005)).[34]

---

**33.** Its consistency, in fact, has been cited as a reason why courts should be wary of blind adherence to Eisenberg and Miller's empirical findings:

> Clever counsel, however, could easily plot a fee percentage at the high end of one standard deviation above the mean and submit that number knowing it would be automatically approved. Moreover, this approach would have the effect of ratcheting the mean upward over time. The Eisenberg and Miller approach ..., is perhaps, in this regard, too scientific in a field that seems to be as much art as science.

*In re Cabletron*, 2006 WL 2947566, at *11 n. 12.

**34.** A district court's scrutinizing of attorney time includes painstaking review of each time entry under the lodestar procedure. The experience level of the attorney and the type of work performed may reduce the hourly rate. For example, the district court may ask such questions as whether the attorney was conducting the deposition or only attending a deposition; whether he or she was traveling at the time or in the office, or how many years of experience the attorney possessed. The court also compares and cross-checks the entries of different attorneys to ensure that any duplication of effort is accounted for and no over-billing occurs. These are just some examples, by no means exhaustive, of the

As noted, the PSC has submitted an accounting of approximately 34,000 hours as of November 10, 2006. This accounting does not include the hours of work performed by the PSC since November 10, 2006, including the considerable time spent in preparation for the fairness hearing. The hours submitted can be broken down as follows: 17,875 committee member hours; 11,941 associate attorney hours; 1,369 paralegal hours; and 2,874 "other hours." (Rec. Doc. 865 Ex. A). After reviewing these materials, the Court finds that 31,185 hours were "reasonably expended." *See Walker*, 99 F.3d at 768. Paralegal hours sometimes are not included within the calculation of attorneys' fees under the lodestar method, but are instead included with costs and expenses. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 569 (E.D.La.1993). However, some courts do include these hours within the lodestar calculation, albeit at a lower rate than that used for partner or associate hours. *See, e.g., In re ETS*, 447 F.Supp.2d at 633. The Court will include these hours within its lodestar computation. However, it will calculate these hours separately from the committee and associate member hours when multiplying the hours expended by an hourly rate. The "other hours" category is comprised of work performed by secretarial staff, which is appropriately characterized as costs rather than attorney work. Accordingly, the Court excludes this amount from its computation.

The Court chooses to separate the hours of the PSC members and associates rather than combining them into a "blended" rate because of the significant time expended by PSC members. The use of blended rates "typically depend[s] on the overall billing mix." *In re HPL Techs., Inc. Sec. Litig.*, 366 F.Supp.2d 912, 921 (N.D.Cal. 2005). Blended rates are appropriate when a majority of the time was spent on discovery. Here, however, significant time was spent on motion practice, class certification, trial preparation, and settlement negotiations, and the PSC members performed a critical role in these activities.

The PSC has not provided any information regarding hourly rates. Though many courts conduct surveys to determine a specific amount that represents the jurisdiction's prevailing hourly rate, the Court chooses to establish a range of reasonable rates rather than attempt to pinpoint the prevailing rate. The range of reasonable rates takes into account the varying degrees of skill and experience of PSC members and associates, the different services performed throughout the conduct of this litigation, and the fact that an hourly rate is fictional in this case since it is not used in contingent fee litigation. Moreover, this method is consistent with the idea of the lodestar cross-check as a simplified or abbreviated version of the traditional method.[35]

The Court believes that ranges of $300 to $400 per hour for PSC members and $100 to $200 per hour for associates reasonably reflect the prevailing rates in this jurisdiction.[36] Additionally, the Court val-

detailed and time-consuming tasks required of the district court if the traditional lodestar method is faithfully applied.

35. For example, some courts, even when conducting the lodestar cross-check, review the legal experience of each attorney who billed time and then establish a specific rate for that individual. A range still acknowledges that individual attorneys bring varying degrees of skill and knowledge to the case, but saves the

court and counsel valuable time and resources.

36. Another court in this district recently determined that the prevailing market rate for partners in this jurisdiction is $350 per hour and $150 per hour for associates, and then established a blended rate of $250 per hour. *In re ETS*, 447 F.Supp.2d at 633. The court also took into consideration the fact that the Special Master was performing services at a rate of $250 per hour, and that he possessed

ues the paralegal services at a rate of $50 to $80 per hour. Using the low end of these ranges for the 17,875 hours expended by the PSC members, the 11,941 hours expended by associates, and the 1,369 hours expended by paralegals, the Court calculates a lodestar baseline of $6,625,050. Using the high end of these ranges for these same numbers of hours results in a lodestar baseline of $9,647,720.

The Court must now decide whether it should "adjust the lodestar by the *Johnson* factors to determine an appropriate multiplier." *In re ETS,* 447 F.Supp.2d at 633. The use of a multiplier is not mandatory. Indeed, a multiplier may not be warranted if the lodestar adequately compensates the attorneys for their services. *See, e.g., Strong,* 137 F.3d at 851 (affirming district court decision not to use multiplier to award additional fees). In the present case, the Court has already considered the *Johnson* factors and concluded that a 2% increase in the benchmark percentage is warranted. Accordingly, the Court finds that a lodestar multiplier range of 2.5 to 3.5 would be appropriate and reasonable in this case. Using a multiplier of 2.5, the total fee calculated under the rough lodestar method is $16,562,625 at the low-end of the range and $23,187,675 at the high end of the range. Using a multiplier of 3.5, the resulting numbers are $24,119,300 at the low end of the range and $33,767,020 at the high end of the range.

After comparing the fee calculated according to the blended percentage method and the range of fees calculated according to the rough lodestar method, it is evident that the blended percentage fee is within the reasonable range provided by the rough lodestar analysis. Although the fee calculated pursuant to the blended percentage method is at the very top of the lodestar range using the highest multiplier and the highest billing rate ($33,746,241.88 under the blended percentage method vs. $33,767,020 under the rough lodestar method), the Court finds an award in this amount appropriate. When the percentage recovery is regarded as too high "in light of the hours devoted to the case or other relevant factors," the percentage may need to be adjusted. *Six (6) Mexican Workers v. Az. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990).

But this is not the case here. The Court's analysis of the *Johnson* factors first suggested that an upward adjustment to the initial benchmark percentage was warranted. This same analysis would also suggest that a high multiplier at the top of the lodestar range is appropriate. Additionally, the Court notes that the time the PSC expended in preparation for the fairness hearing and management of this case since November 10, 2006 is not included in the rough lodestar calculation. These hours surely represent a significant amount of time that was not accounted for in the above computations. Therefore, the Court determines that the lodestar cross-check firmly supports an award of $33,746,241.88.

### 7. Fee Award

For the foregoing reasons, the Court awards attorneys' fees of $33,150,000, which is equivalent to 17% of $195,000,000, plus a sum equivalent to the amount of money that has been held in escrow for the PSC's contribution to voluntary settlements, $596,241.88. Thus, the Court finds that the PSC is entitled to $33,746,241.88, to be paid by Murphy as attorneys' fees.

The Court will leave the apportionment of this award up to the PSC attorneys

---

the same caliber and experience as counsel in that case. *Id.; see also Speaks v. Kruse,* No. 04–1952, 2006 WL 3388480, at *3–7 (E.D.La.

Nov.20, 2006) (discussing hourly rates in this district).

themselves. *See Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir.1992) (citing *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 216, 223 (2d Cir.1987)); *see also Batchelder,* 246 F.Supp.2d at 534. If they are unable to agree upon the apportionment, the Court will appoint a Special Master and his or her fee for services related to this issue will be paid out of the fee award for those who contest their allotment. The Court retains jurisdiction for purposes of supervising the allocation.

### C. Expenses

Upon review of the materials submitted, the Court finds an adequate basis for an award of $2,659,043 for litigation expenses. The Court also notes that Murphy does not contest the reasonableness of these costs.

### D. Incentive Awards to Class Representatives

Courts "commonly permit payments to class representatives above those received in settlement by class members generally." *Smith v. Tower Loan of Miss., Inc.,* 216 F.R.D. 338, 367–68 (S.D.Miss.2003); *see In re Catfish Antitrust Litig.,* 939 F.Supp. at 503–04. Eisenberg and Miller have also performed an empirical study of incentive payments to class representatives and have identified several justifications. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study,* 53 UCLA L.Rev. 1303 (2006). Class representatives must be familiar with the case in order to be adequate representatives and are often deposed. In this case, the representatives also submitted affidavits demonstrating familiarity with the Settlement Agreement and expressing their approval of it. Accordingly, the Court will award $1,500 to each class representative.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that the parties' Joint Motion for Final Approval of the Class Action Settlement (Rec.Doc. 1034) is GRANTED and that the Settlement Agreement is hereby APPROVED.

IT IS FURTHER ORDERED that the PSC's Motion for Common Benefit Fees and Expenses (Rec.Doc. 865) is GRANTED IN PART and that (1) Murphy shall pay a total of $33,746,241.88 in attorneys' fees and (2) Murphy shall pay $2,659,043 in expenses, with legal interest on these amounts until paid in full. Furthermore, Murphy shall pay $1,500 to each of the following class representatives: Phyllis N. Michon, Cherie Scott Perez, James Shoemaker, Fernand Marsolan, and Robin Diaz Clark.

IT IS FURTHER ORDERED that Pretrial Order No. 8 (Rec. Doc 277) and Pretrial Order No. 8A (Rec.Doc. 284) are hereby VACATED and that all amounts set-aside from voluntary settlements in accordance with these Pretrial Orders shall be refunded to the parties from whom they were withheld. A Judgment consistent with this Order & Reasons will be issued forthwith.

### *FINAL JUDGMENT PURSUANT TO RULE 54(b) APPROVING CLASS ACTION SETTLEMENT AND AWARD OF COMMON–BENEFIT FEES AND EXPENSES*

Considering the evidence presented and the record made at the Fairness Hearing conducted in this matter on January 4, 2007, and for the reasons stated in the Court's Order & Reasons accompanying this Final Judgment,

IT IS ORDERED that the proposed class settlement is APPROVED as fair, reasonable, and adequate, pursuant to

Rule 23(e)(1)(C) of the *Federal Rules of Civil Procedure.*

IT IS FURTHER ORDERED that each and every term, provision, condition, and agreement of the Settlement Agreement, including all exhibits and amendments thereto, apply and are adopted, incorporated, and made part of this Judgment, as if copied herein *in extenso* and shall be effective, implemented, and enforced as provided in the Settlement Agreement.

IT IS FURTHER ORDERED that Murphy pay a common-benefit fee in the amount of $33,746,241.88, and reimburse class counsel the total of $2,659,043 in common-benefit expenses, with legal interest on these amounts until paid in full.

IT IS FURTHER ORDERED that Murphy pay $1,500 to each of the following class representatives: Phyllis N. Michon, Cherie Scott Perez, James Shoemaker, Fernand Marsolan, and Robin Diaz Clark.

IT IS FURTHER ORDERED that Pretrial Order No. 8 (Rec. Doc 277) and Pretrial Order No. 8A (Rec.Doc. 284) are hereby VACATED and that all amounts set-aside from voluntary settlements in accordance with these Pretrial Orders shall be refunded to the parties from whom they were withheld.

IT IS FURTHER ORDERED that the Class Action and all cases consolidated with or therein, and all other actions now existing or hereafter brought asserting any Released Claims, as that term is defined in Section IX of the Settlement Agreement, by any Class Member, are hereby DISMISSED WITH PREJUDICE upon the Final Settlement Date as defined in Section II.13 of the Settlement Agreement, with each party to bear its own costs, excluding only the claims of those individuals or entities who properly and timely opted out of the Class as defined.

IT IS FURTHER ORDERED that all Class Members (including, without limitation, all persons and entities claiming by, through, or on behalf of a Class Member) are hereby finally and permanently barred and enjoined from pursuing and/or asserting any and all Released Claims.

IT IS FURTHER ORDERED that as of the Final Settlement Date, the Released Parties are hereby finally released from any and all Released Claims by, through, or on behalf of a Class Member.

IT IS FURTHER ORDERED that this Judgment extinguishes any liability of the Released Parties with respect to any cause of action related to the Released Claims, whether those claims are asserted against any Released Party or any other party.

IT IS FURTHER ORDERED that any and all persons, but excluding only those individuals and entities who properly and timely opted out of the Class as defined, are hereby finally and permanently barred and enjoined from pursuing and/or bringing against Murphy, and the Released Parties, any cause of action related to the Incident as set forth in Section II.14 of the Settlement Agreement (including, without limitation, all causes of action based on claims of the Class as set forth in the Master Consolidated Class Action Complaint).

IT IS FINALLY ORDERED that, pursuant to Rule 54(b) of the *Federal Rules of Civil Procedure,* there is no just reason for delay in the entry of this Judgment.

## ORDER & REASONS ON MOTION FOR NEW TRIAL AND TO ALTER OR AMEND THE JUDGMENT

Before the Court is Defendant Murphy Oil USA, Inc.'s ("Murphy") Motion for a New Trial and to Alter or Amend the Judgment (Rec.Doc. 1103). For the following reasons, the motion is DENIED.

Murphy argues that it is entitled to a new trial as to the award of common-

benefit fees and expenses in the Court's Final Judgment Pursuant to Rule 54(b) Approving Class Action Settlement and Award of Common–Benefit Fees and Expenses ("Final Judgment") as the award is contrary to the weight of the evidence. Murphy also moves pursuant to Federal Rules of Civil Procedure 52(b), 59(e), and 60 to alter or amend the Final Judgment as to the award of interest on common-benefit attorneys fees and expenses and to alter or amend the Court's Order & Reasons Approving the Class Action Settlement and Award of Common–Benefit Fees and Expenses ("Order & Reasons") to delete a statement regarding settlement compensation.[1] The Court addresses each of these arguments in turn.

### 1. Motion for a New Trial on Common–Benefit Fees and Expenses

Rule 59(a) of the Federal Rules of Civil Procedure provides that a new trial may be granted to any party on any issue in an action tried with or without a jury. In this case, the parties agreed, with the Court's approval, that the award of common-benefit fees and expenses would be submitted to the Court on briefs, as Rule 23 of the Federal Rules of Civil Procedure does not require a trial or evidentiary hearing on this issue. Thus, Rule 59(a) is not available to Murphy in this case, and the proper procedural vehicle is a Rule 59(e) motion to alter or amend a judgment.

In any event, the Court does not find that the judgment awarding common-benefit fees and expenses is against the weight of the evidence for the reasons previously stated by the Court in its Order & Reasons. Murphy did not file any statements opposing the amount of costs the PSC claims it incurred, nor did it formally request supporting documentation from the

PSC. *See* Def.'s Resp. Opp'n to PSC Mot. for Common–Benefit Fees and Expenses (Rec.Doc. 922). After a review of the PSC's motion and attached exhibits, including the Affidavit of Dennis McCartney of the accounting firm Bourgeois Bennett, the Court found that the costs submitted were reasonable, Accordingly, the Court will not revisit the issue.

Nor will the Court re-examine the amount of hours expended by the PSC for work on this case. In its analysis of common-benefit fees, the Court stated in its Order & Reasons that it would employ the blended percentage method accompanied by a rough lodestar cross check. Thus, the specific amount of hours the PSC reported provided only a rough estimate. In fact, the Court concluded that the total number of PSC hours was probably under-reported because the hours submitted only accounted for work ending on November 10, 2006 and did not include any hours related to the fairness hearing preparation or issues arising after final settlement approval, which have been significant. Additionally, a main contention of Murphy with the PSC's submission of hours is the inclusion of 2,874 "other hours." However, the Court did not include the 2,874 "other hours" in its rough lodestar crosscheck because it found that these hours accounted for secretarial work. (Order & Reasons 62.)

### 2. Amendment of Judgment Regarding Interest on Common–Benefit Fees and Expenses

Murphy also argues that the Final Judgment should be amended under Rules 52(b), 59(e), and 60 because the award of interest on the common-benefit fees and expenses is contrary to the parties' agree-

---

1. As the Court finds that Murphy's arguments to alter or amend the Final Judgment and Order & Reasons lack merit, it need not de- termine which of these Rules of Civil Procedure is the appropriate procedural vehicle for this motion.

ment and represents a material change to the Settlement Agreement. Murphy cites the following language from the Settlement Agreement in support of its contention:

The amount of any award by the Court of any common benefit attorneys' fees and expenses shall be paid by the Compromising Defendants over and above the benefits provided to the Class set forth in Section VI above, within seven (7) days after the Final Settlement Date is reached. Under no circumstances shall the Compromising Defendants be required to make any further contribution to the settlement or to the Recovery Program on account of compensation to the PSC, private counsel for Class members, or administrative or other expenses associated with this settlement.

(Settlement Agt. § XII(4).)[2] However, awards of attorneys' fees commonly include both the principal amount and the accrual of legal interest. Nothing in the Settlement Agreement language cited above provides that the award would not include legal interest in this case. Therefore, the Court will not amend the Final Judgment on this point.

### 3. Amendment of Order & Reasons Regarding Deletion of Statement

Lastly, Murphy contends that the Order & Reasons should not include the statement that "the settlement compensates class members for crude oil damage to property only, and not for personal injury." (Order & Reasons 57.) Murphy suggests that the Order & Reasons should be amended under Federal Rules of Civil Procedure 52(b), 59(e), and 60 to delete this statement and substitute language providing that "the settlement here is to compensate class members primarily for crude oil damage to property, with personal injury claims being less significant." Def.'s Mem. Supp. Mot. 11.

The Order & Reasons must be read as a whole and one sentence cannot be read in isolation. The Court made the statement that the Settlement Agreement compensates the class for "property damage only" in the context of addressing the PSC's argument that customary contingent fees in personal injury suits are between 33% and 40%. It simply meant to distinguish the present case where property damage dominates from other tort litigation where there is generally no property damage and only personal injury claims exist. Reading this statement in the context of the entire decision, it is clear that a portion of the settlement award includes compensation for claims for personal injury and environmental damage, among other damages. For example, the Final Judgment states that class members release any and all claims against Murphy, and the Order & Reasons clearly states that the class members sought claims for personal injury. (Order & Reasons 6, n. 5.) Additionally, the Order & Reasons states that "[t]he Court notes that the class members' claims were essentially property damage claims" when discussing the novelty and difficulty of the questions involved for determination of common-benefit fees. (Order & Reasons 57.) Accordingly, it is not necessary to amend the Order & Reasons.

---

**2.** The Settlement Agreement defines the Final Settlement Date as:

the date on which all of the following have occurred: (i) entry of the Final Order and Judgment consistent with this Agreement and (ii) finality of the Final Order and Judgment by virtue of that order having become final and nonappealable through (1) the ex-

piration of all allowable appeal periods without an appeal having been filed or (2) final affirmance of the Final Order and Judgment on appeal or final dismissal or denial of all such appeals, including petitions for review, rehearing, reargument, mandamus or certiorari. Settlement Agt. § II(13).

For the foregoing reasons, IT IS OR-DERED that the Defendant's motion is hereby DENIED.